OPINION
{¶ 1} Appellant Christopher Anderson was convicted in the Mahoning County Court of Common Pleas on one count of murder and was sentenced to a prison term of fifteen years to life. The murder victim was 22-year-old Amber Zurcher, who was strangled to death in her apartment on June 3, 2003. This appeal involves a number of evidentiary challenges, as well as claims of ineffective assistance of counsel and an assertion that the verdict was against the manifest weight of the evidence. Appellant's most significant argument deals with the testimony of two witnesses, Donna Dripps and Bradley Windle. During the first trial of this case, the prosecutor intended to introduce evidence that Appellant attacked and strangled Donna Dripps in a manner similar to the Amber Zurcher attack. The trial judge excluded any mention of the Donna Dripps incident and ultimately declared a mistrial after a witness mentioned the incident. On retrial, though, the trial court allowed Donna Dripps to testify completely about the prior attack. The other witness was Bradley Windle, Appellant's probation officer. Upon retrial, Mr. Windle was permitted to testify concerning a number of probation violations that purportedly occurred immediately prior to and during the investigation of the murder of Amber Zurcher. Appellant contends that the testimony of these two witnesses was impermissible "other bad acts" evidence under Evid.R. 404(B). For the following reasons, we conclude that the trial court erred in allowing Donna Dripps and Bradley Windle to testify, and Appellant's conviction is hereby reversed and the case remanded for retrial.
 FACTUAL AND PROCEDURAL HISTORY {¶ 2} In June of 2003, Amber Zurcher was 22 years old, attended Youngstown State University and was working as a waitress. She also had a four-year-old child. At approximately 11:00 p.m. on the evening of June 2, 2003, Amber went to Chipper's Bar in Youngstown. (11/18/03 Tr., p. 472.) A number of her friends and acquaintances were there, including John Orosz, a friend who grew up in the same home as Amber but was not actually related to her. John Orosz owned a pizza shop near Chipper's Bar, and he went from the pizza shop to the bar a number of times in the course of the evening. The following people were also at Chipper's Bar that night: Sandy Shingleton, a close friend of Amber's; Lynn Sanisteven, sister of Sandy Shingleton; Vivian Campati, a fairly recent acquaintance of Amber's; Anthony (Tony) Loibl, a friend from Amber's high school days; and Dino Socciarelli, another friend of Amber's. Appellant was at the bar as well.
 {¶ 3} After the bar closed, all the aforementioned people went to Amber's apartment, located at 1031 Compass West, in Austintown. (11/18/03 Tr., p. 565.) They continued drinking, and some of them became extremely intoxicated during the evening. Some of the people were smoking marijuana. At approximately 2:30 a.m., John Orosz, Lynn Sanisteven, and Appellant left the apartment to go to Orosz's pizza shop. (11/18/03 Tr., p. 405.) According to Orosz, the three of them made pizzas and sandwiches, delivered some pizzas to the west side of Youngstown, and then returned to Amber's apartment. (11/18/03 Tr., p. 405.) After this, various people began leaving the party. Dino and Vivian left first. (11/18/03 Tr., pp. 523-524.) Tony and Lynn left together sometime later. At that point, Amber was in the apartment with John Orosz, Sandy Shingleton and Appellant. Sandy was asleep in the bedroom while the other three sat and talked in another room.
 {¶ 4} At approximately 3:50 a.m. the three remaining guests — John Orosz, Sandy Shingleton and Appellant — left Amber's apartment. (11/18/03 Tr., p. 408.) Orosz gave Amber a hug, locked the door from the inside, closed the door, and checked to see that it was locked. (11/18/03 Tr., p. 410.) Orosz testified that Amber was fully clothed at the time he left. (11/18/03 Tr., p. 410.) Orosz, Shingleton and Appellant then left in Appellant's car. Appellant drove the short distance to Orosz's pizza shop, and dropped off the two passengers. (11/18/03 Tr., p. 425.) Appellant drove away, and Orosz did not know his destination. (11/18/03 Tr., p. 425.)
 {¶ 5} Later that morning, Amber's mother (Diane Whiteman) was concerned that Amber had not picked up her son. Amber was scheduled to pick up her son at 6:00 a.m. After a number of unsuccessful attempts to reach her by phone, Ms. Whiteman went to Amber's apartment. She obtained a key from the apartment manager, entered the apartment, and found her daughter dead, lying naked on the floor near the door. She immediately called the police. Later investigations did not find any signs of forced entry into the apartment, and the apartment did not appear to have been robbed. (11/18/03 Tr., p. 569.)
 {¶ 6} There were ligature marks around Amber's neck consistent with strangulation by a cord or wire. (11/18/03 Tr., p. 577.) The police were not able to identify what cord or wire was used to strangle her.
 {¶ 7} Samples were taken from under Amber's fingernails and from a bite wound in her left breast. Appellant's DNA was identified in the fingernail sample, along with that of her son and an unidentified third person. Only Appellant's DNA was found in the breast wound.
 {¶ 8} On June 6, 2003, the day of Amber's funeral, a number of her friends gathered at Chipper's Bar to reminisce. Appellant arrived and was wearing a jacket with long sleeves. When he removed the jacket, witnesses noticed scratches on his hands and arms that were not there three nights earlier. John Orosz confronted Appellant about the scratches. (11/18/03 Tr., p. 416.) Orosz also contacted the police with this information. Appellant failed to show up at the police station to have pictures taken of the scratches or to discuss the DNA test results. (11/18/03 Tr., p. 613.)
 {¶ 9} On August 20, 2003, detectives executed a search warrant of Appellant's home. An arrest warrant was issued soon afterward, but police could not locate Appellant. On August 22, 2003, based on an anonymous tip, Appellant was located and arrested at the Super 8 Motel in Liberty Township, Trumbull County. The room was not registered in Appellant's name.
 {¶ 10} On August 29, 2003, Appellant was indicted for the murder of Amber Zurcher pursuant to R.C. § 2903.02(A), (D). Appellant was found to be indigent, and counsel was appointed. Trial was set for May 27, 2003. On the day of trial, Appellant filed a motion to prevent the state from introducing evidence of prior bad acts as set forth in Evid.R. 404. Appellant wished to prevent Donna Dripps from testifying about an incident in which Appellant allegedly choked her and bit her on one breast. Appellant also wished to prevent Bradley Windle, his probation officer, from testifying. The trial judge sustained the motion to prohibit any evidence involving the Donna Dripps' incident; Bradley Windle was permitted to testify under certain restrictions. (5/27/03 Tr., pp. 334 ff.)
 {¶ 11} During the trial, witness Nichole Ripple made a reference to the attack on Donna Dripps. (5/27/03 Tr., p. 374.) Ms. Ripple testified that: "[Amber] said, no, he's a freak. He tried to strangle his ex-girlfriend." (5/27/03 Tr., p. 374.) Ms. Ripple's comment was repeated on the evening news. The next day, the trial court declared a mistrial based on the undue prejudice caused by Ms. Ripple's comment and by the media attention to it.
 {¶ 12} Retrial was scheduled for November 18, 2003. Prior to retrial, the state filed a motion in limine to allow Donna Dripps and Bradley Windle to testify. (10/15/03 Motion in Limine.) Appellant did not respond to the motion. The motion was heard immediately prior to retrial, and Appellant's counsel indicated then that he had not received the motion. The court proceeded with the hearing, and Appellant's counsel restated his earlier arguments concerning the unfounded nature of Donna Dripps' testimony. He also relied on the fact that the trial court had declared a mistrial based on the slightest mention of the incident. The trial court changed its position, though, and allowed Donna Dripps to testify. She described an incident on February 16, 2002, in which she was visiting her brother and his roommate, and in which Appellant was also present. (11/18/03 Tr., pp. 781-782.) She testified that at about 4:00-4:30 a.m., Donna's brother and roommate went to bed upstairs and she was left alone in the room with Appellant. (11/18/03 Tr., p. 786.) She stated that Appellant kissed her, picked her up and carried her to a bedroom, put his hands around her throat and choked her. She testified that he fondled and grabbed her, and bit her on the breast. (11/18/03 Tr., p. 788.) She noted that he did not attempt to unbutton or take off her pants. She recalled that the struggle lasted about 20 minutes, after which Appellant rolled off of her and passed out. (11/18/03 Tr., p. 791.)
 {¶ 13} During trial, a number of the people who had been at Amber's apartment on the morning of the murder were called to testify, including Sandra Shingleton, Anthony Loibl, Vivian Campati, and Dino Socciarelli. They testified about the events leading up to the time of the murder, and they all identified Appellant as being at the party at Amber's house. Orosz testified extensively as to the timing of the events of that night. He indicated that he left with Appellant and Sandy Shingleton just before 4:00 a.m., and that Amber was alive and well at that time.
 {¶ 14} Deputy Coroner Jesse Giles testified that the approximate time of death was 4:00 a.m. Amber had multiple bruises on her body, and there was a distinct contusion on her left breast that appeared to be "more of a love bite or a hickey or a sucker bite." (11/18/03 Tr., p. 740.) She also had a deep scalp contusion. All of these occurred fairly close to the time of death. There were ligature marks completely around her neck, indicating at least four loops of some type of cord. The precise type of cord was not identified. The cause of death was determined to be asphyxia due to ligature strangulation. (11/18/03 Tr., p. 758.)
 {¶ 15} Melissa Zielaskiewicz, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation, testified that Appellant's DNA was found in the test sample taken from Amber's left breast. (11/18/03 Tr., p. 833.) No other person's DNA was found in that sample. Appellant's DNA was also found under Amber's left fingernails, along with a lesser amount of DNA from Amber's son and that of an unidentified third person. (11/18/03 Tr., pp. 834-838.) There was no evidence of foreign DNA in the oral, vaginal, or rectal samples taken from Amber. (11/18/03 Tr., p. 828.)
 {¶ 16} On November 26, 2003, the jury returned a guilty verdict on the charge of murder. After a sentencing hearing, Appellant was sentenced to 15 years to life in prison. (12/4/03 J.E.) This timely appeal followed.
 ASSIGNMENT OF ERROR NO. 1 {¶ 17} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION IN LIMINE AND PERMITTING AT TRIAL WITNESS TESTIMONY CONTRARY TO OHIO RULES OF EVIDENCE 402 AND 403(A), WHEN SUCH EVIDENCE WAS NOT RELEVANT AND ITS ADMISSION OUTWEIGHED THE DANGER OF PREJUDICE TO APPELLANT RECEIVING A FAIR TRIAL."
 {¶ 18} In this assignment of error, Appellant challenges the trial court's decision to allow the testimony of two witnesses. The two evidentiary issues will be treated separately.
A. The testimony of Donna Dripps.
 {¶ 19} The first issue involves the testimony of Donna Dripps, who testified that Appellant had attacked her on February 16, 2002, which was approximately four months before Amber Zurcher was murdered. Donna testified that she was at her brother's house in the early morning hours of February 16, 2002. (11/18/03 Tr., p. 784.) Also present were her brother, one of his friends, and Appellant. They all were watching television and talking. At about 4:00 or 4:30 a.m., her brother and his friend left the room, leaving her alone in the room with Appellant. (11/18/03 Tr., p. 786.) Appellant tried to kiss her and she backed away. He then picked her up, carried her to a spare bedroom, laid her down and put his hand around her throat while he was on top of her. (11/18/03 Tr., p. 787.) He continued to kiss her. She was scared and attempted to resist. She could not breathe, though, and eventually stopped resisting. She testified that Appellant continued touching and grabbing her, then bit her on the breast, which left a bruise. (11/18/03 Tr., pp. 788, 794.) He did not try to unbutton her pants or have any sexual contact below her waist. Twenty minutes after he began this attack, he rolled off of her and passed out. (11/18/03 Tr., p. 791.) She immediately left the house and ran home. Her boyfriend was there, and he called 911. (11/18/03 Tr., p. 793.)
 {¶ 20} Appellant first argues that this testimony was either irrelevant or that its probative value was outweighed by its inflammatory impact on the jury, in violation of Evid.R. 403, which states:
 {¶ 21} "(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 {¶ 22} "(B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."
 {¶ 23} Appellant also contends that evidence of prior crimes or prior bad acts is not admissible to prove that the defendant acted in conformity with his or her bad character, referring to Evid.R. 404(B), which states:
 {¶ 24} "(B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 25} This rule is in accord with R.C. § 2945.59, which states:
 {¶ 26} "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."
 {¶ 27} It is well established that the admission or exclusion of evidence rests within the sound discretion of the trial court.State v. Robb (2000), 88 Ohio St.3d 59, 68, 723 N.E.2d 1019. Absent an abuse of discretion, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. State v. Martin (1985), 19 Ohio St.3d 122, 129,483 N.E.2d 1157. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. State v. Adams
(1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.
 {¶ 28} Under Evid.R. 404(B) and R.C. § 2945.59, "other bad acts" evidence is not admissible to establish the defendant's bad character or criminal propensity, but may be introduced to prove a criminal scheme, plan, or system, and by extension, may be used to establish the identity of the person who committed the crime.State v. Lowe (1994), 69 Ohio St.3d 527, 530, 634 N.E.2d 616;State v. Curry (1975), 43 Ohio St.2d 66, 73, 72 O.O.2d 37,330 N.E.2d 720. Identity can be proven by establishing a modus operandi or behavioral fingerprint applicable to the crime with which a defendant has been charged. Lowe at 531. In order, "[t]o be admissible to prove identity through a certain modusoperandi, other-acts evidence must be related to and share common features with the crime in question." Id. at paragraph one of the syllabus. "One recognized method of establishing that the accused committed the offense set forth in the indictment is to show that he has committed similar crimes within a period of time reasonably near to the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and the other crimes." Curry, supra, 43 Ohio St.2d at 73.
 {¶ 29} Because R.C. § 2945.59 and Evid.R. 404(B) are exceptions to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict. State v. Broom (1988), 40 Ohio St.3d 277,533 N.E.2d 682, paragraph one of the syllabus. The evidence must, "tend to show by substantial proof," that one of the enumerated exceptions applies to overcome the general rule prohibiting evidence of other crimes or bad acts. State v. Goines (1996),111 Ohio App.3d 840, 844, 677 N.E.2d 412, citing Broom, supra. The First District Court of Appeals has concluded that, "[v]ery seldom is evidence of different crimes sufficiently similar to be a behavioral fingerprint." State v. Echols (1998),128 Ohio App.3d 677, 693, 716 N.E.2d 728. The Ohio Supreme Court has also held that:
 {¶ 30} "This rule, commonly referred to as the `propensity rule,' constitutes a standing bar, upon the ground of irrelevancy, to any attempt to prove the commission of the crime charged by evidence of a like previous act. See, e.g., 42 Ohio Jurisprudence 3d (1983), Evidence and Witnesses, Section 206. While ordinarily not rising to the level of constitutional significance, the introduction of such evidence may be highly prejudicial (Evid.R. 403) when the former crime or act is utilized in a subsequent trial which has, as its central issue, the question of whether the defendant committed the same kind of act." State v. Zuern (1987), 32 Ohio St.3d 56, 59,512 N.E.2d 585.
 {¶ 31} Thus, even if other bad acts evidence might be admissible under Evid.R. 404, it must still pass the test set forth in Evid.R. 403, namely, that the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice, or the danger of confusing or misleading the jury. State v. Myers, 97 Ohio St.3d 335, 2002-Ohio-6658,780 N.E.2d 186; Zuern, supra.
 {¶ 32} The Ohio Supreme Court has also explained that:
 {¶ 33} "Although such [other bad acts] evidence may, in some cases, logically tend to establish that a criminal defendant committed the act for which he stands accused, the evidence is considered legally irrelevant for the reasons enumerated inWhitty v. State (1967), 34 Wis.2d 278, 292, 149 N.W.2d 557:
 {¶ 34} "`* * * (1) The overstrong tendency to believe the defendant guilty of the charge merely because he is a person likely to do such acts; (2) the tendency to condemn not because he is believed guilty of the present charge but because he has escaped punishment from other offenses; (3) the injustice of attacking one who is not prepared to demonstrate the attacking evidence is fabricated; and (4) the confusion of issues which might result from bringing in evidence of other crimes.'"Curry, supra, 43 Ohio St.2d at 68.
 {¶ 35} Appellant contends that there is no rational explanation why the trial judge would exclude all mention of the Donna Dripps incident from Appellant's first trial and yet completely allow it in the second. There is nothing in the record that explains what specifically occurred to change the trial judge's mind. On the day that the first trial began, May 27, 2003, Appellant filed a motion in limine to preclude or limit the testimony of Donna Dripps regarding the prior attack. The trial judge sustained Appellant's motion in limine, concluding that:
 {¶ 36} "Concerning the testimony of Dripps, it's the opinion of the Court that the potential — that the introduction of any evidence such as was submitted to the Court for review would create a risk that the jury would convict the defendant based on an inference, particularly in viewing the Dripps incident in total; in other words, not cooperating at the time, not having any medical documentation of the bite, and/or any other injury. I would just feel that it would be prejudicial to the case in this matter." (5/27/03 Tr., p. 334.)
 {¶ 37} During the first trial, though, a witness unexpectedly spoke about the incident. The witness was Nichole Ripple, Amber's good friend. Ms. Ripple testified as to certain statements that Amber made about Appellant, which included the following statement: "And she said, no, he's a freak. He tried to strangle his ex-girlfriend." (5/27/03 Tr., p. 374.) This statement apparently received extensive coverage in the news media, and the trial judge himself saw the story on the news. (5/27/03 Tr., pp. 397, 399.) The trial judge subsequently declared a mistrial based on the undue prejudice caused by Ms. Ripple's statement.
 {¶ 38} Prior to the second trial, the state filed a motion in limine to allow Donna Dripps to testify, and also to allow the testimony of Appellant's parole officer, Bradley Windle. (10/15/03 Motion in Limine.) A little more than a week later, the state filed another motion in limine requesting an order preventing Appellant from eliciting hearsay statements from the state's witnesses. (10/27/03 Motion in Limine.) Appellant filed a response to the second motion in limine, but not to the first. Immediately prior to the second trial, the state's motions were heard. Appellant's attorney indicated that he never received a copy of the October 15, 2003, motion, and was taken by surprise by the request to allow Donna Dripps to testify in light of the first mistrial. (11/18/03 Tr., p. 17.) Despite counsel's protests, the trial court proceeded to hear the motion concerning the testimony of Donna Dripps and Bradley Windle.
 {¶ 39} The state argued that evidence of Appellant's prior attack on Donna Dripps was necessary to prove identity rather than to prove that Appellant acted in conformity to his character. (11/18/03 Tr., p. 42.) It is clear that one of the main issues in this case was whether or not Appellant was the person who murdered Amber, and the state wanted to use Donna Dripps' testimony to show that the way Amber was murdered was a signature act very similar to the attack on Ms. Dripps.
 {¶ 40} Appellant's counsel responded to these arguments by pointing out that the trial judge based the prior mistrial on a single reference to the attack on Ms. Dripps. (11/18/03 Tr., pp. 43-45.) Counsel also argued that identity did not need to be proven by Ms. Dripps' testimony because the state had DNA evidence to present. (11/18/03 Tr., p. 47.) Counsel further argued that Ms. Dripps did not receive any medical treatment after the incident and that the state had no documentation of the attack at all. Counsel also argued that the attack on Ms. Dripps was substantially different than Amber's murder primarily because no weapon was used against Ms. Dripps, whereas Amber was strangled by some type of wire or cord. (11/18/03 Tr., p. 48.)
 {¶ 41} The state responded by arguing that the earlier trial involved a different issue because the attack on Donna Dripps was raised in hearsay evidence, and the hearsay problem was the primary source of the error. The state argued that the attack was mentioned by Nichole Ripple by way of a comment that Amber supposedly made about Appellant. In the second trial, the state intended to have Donna Dripps testify for herself. The state also argued that the fact that there was DNA evidence did not mean that identity was not an issue in the case, and that the state is not limited to submitting only one piece of evidence to prove identity.
 {¶ 42} Appellant's counsel responded by pointing out that the original mistrial was due to the undue prejudice caused by the mere mention that Appellant had tried to strangle another woman prior to the murder of Amber, and had nothing to do with hearsay violations. The trial judge's comments from the first trial clearly support this conclusion:
 {¶ 43} "The Court, taking into consideration and after having received the transcript of the testimony of Nichole Ripple concerning the issue raised by both counsel, is of the opinion that a mistrial is in order. Taking it all into consideration, and the fact that the Court saw the 11 o'clock news, the zooming in on Nichole Ripple, where she blatantly made the comment he tried to strangle his ex-girlfriend, I don't see any way of getting around it. And the remark was too prejudicial, and the Court's of the opinion that any corrective measures taken by the Court would be determined to be impermissible; therefore, a mistrial is in order." (5/27/03 Tr., pp. 399-400.)
 {¶ 44} The trial court considered these same arguments at retrial and somehow concluded that the circumstances surrounding Donna Dripps' testimony had changed since the first trial. (11/18/03 Tr., p. 58.) The trial court stated that the prosecution had not significantly argued in the first trial that the attack on Donna Dripps tended to show identity, or that identity would be an issue in the case. (11/18/03 Tr., p. 61.) The court noted that the statement by Nichole Ripple was also blurted out without any context and then repeated in the local news media. (11/18/03 Tr., p. 58.) The court also mentioned that the two attacks were very similar and occurred within a short time span. (11/18/03 Tr., p. 61.) The trial judge then sustained the state's motion in limine, and Donna Dripps subsequently testified extensively about the prior attack. Appellant's counsel renewed his objection during trial.
 {¶ 45} We find it difficult, if not impossible, to correlate the two opposing decisions by the trial court on this matter. Although the trial judge tried to distinguish the way the issue was presented in the two trials, the record does not reveal any fact or argument that had changed by the time he made his second ruling. Appellant's first motion in limine, filed on May 27, 2003, raised all the same arguments that were discussed at the hearing in the second trial, including an extensive discussion about the state attempting to use the attack on Donna Dripps to prove identity. Appellant argued both times that the evidence of the prior attack was unsubstantiated, and that even if it did overcome the objections regarding inadmissible character evidence under Evid.R. 404, the evidence was so inordinately prejudicial that it should be excluded under Evid.R. 403. The state responded to Appellant's first motion on May 28, 2003, and made exactly the same arguments in the second trial, namely, that Donna Dripps' testimony would be used to prove that Appellant had a distinct way of committing his crimes, and that this operational fingerprint would tend to identify Appellant as the murderer of Amber. (5/28/03 Response, p. 8.) These were the arguments before the court in the first trial, in which the court ruled in Appellant's favor and then declared a mistrial when this prior attack was merely mentioned by another witness.
 {¶ 46} We acknowledge that there is no particular rule that would prevent a trial judge from changing his mind regarding a motion in limine, and in fact, the very essence of a motion in limine is that it is not a final ruling, but rather, is a, "tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated but has not yet been presented in its full context." State v. Grubb (1986),28 Ohio St.3d 199, 203, 28 OBR 285, 503 N.E.2d 142. In this case, though, a violation of the original motion in limine ruling resulted in a mistrial, and there is nothing tentative or preliminary about a mistrial. A mistrial is an extreme remedy, "declared only when the ends of justice so require and a fair trial is no longer possible." State v. Franklin (1991), 62 Ohio St.3d 118, 127,580 N.E.2d 1, citing Illinois v. Somerville (1973),410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425. Once the mistrial was declared, Appellant should have been allowed to rely on the trial court's ruling regarding Donna Dripps' testimony and proceed with his defense in light of that ruling.
 {¶ 47} Appellant further argues that Donna Dripps' testimony was not necessary to prove identity because the identity of the murderer was not in dispute. Appellant is correct that other acts evidence is only permitted to establish a disputed material element of the case. Curry, supra, 43 Ohio St.2d at 73. Appellant is also correct that the state had strong evidence apart from Donna Dripps' testimony that identified Appellant as the person who committed the crime, thus making her testimony somewhat unnecessary. There was the highly incriminating DNA test results. There were the scratches on Appellant's hands and arms, coupled with the fact that his DNA was found under Amber's fingernails. There was the clear evidence that Appellant was with Amber just a short time before the crime occurred. These facts are all very powerful indicators that Appellant was the assailant.
 {¶ 48} Donna Dripps' testimony, though, did not prove identity in the same way as the DNA evidence. The DNA evidence could prove that Appellant had been scratched by Amber, or that he bit her, but it did not necessarily establish that he strangled her or killed her. Appellant's counsel, at closing argument, admitted that Appellant left his DNA on Amber's breast, but intimated that it happened during the party and not during the murder. (11/18/03 Tr., p. 961.) Thus, Appellant's counsel believed that the identity of the murderer was in dispute, and that the DNA evidence did not provide a complete picture as to the identity of the murderer.
 {¶ 49} The purpose of Donna Dripps' testimony was to show that Appellant had a method of assaulting women by choking or strangling them and also by biting them on the breast. This goes to identifying Appellant as the person who committed the crime rather than as merely a person who was at Amber's apartment on the morning of the crime. There is no question that Donna Dripps' testimony is relevant and adds to the identification of Appellant as the assailant. The next important question, though, is whether the entire Donna Dripps' incident is unfairly prejudicial compared to its probative value.
 {¶ 50} Appellant has presented a persuasive case that the probative value of Donna Dripps' testimony was outweighed by the danger of unfair prejudice. First, the trial judge had already ruled in the prior trial that the evidence was unfairly prejudicial, and a mistrial was declared based on a violation of the trial court's order to exclude such evidence. It is not really Appellant's reasoning, but rather, the trial court's reasoning in the first trial, that is most persuasive.
 {¶ 51} Second, Donna Dripps was the only witness presented by the state to prove Appellant's identity by establishing a modus operandi. Obviously, to show that Appellant had a criminal plan or signature method of committing a crime, there must be at least two clear examples of it occurring, i.e., the criminal event that is being prosecuted, and the prior or subsequent event that is used as a comparison. As a practical matter, if there are fewer details that actually match in comparing each supposedly signature episode, then more examples would be needed to show a true pattern. There is no strict guideline in determining when modus operandi can be proven by comparing only two similar incidents, or when the dissimilarities or unreliability of the evidence requires more examples in order to establish a true pattern. We must repeat, though, that the introduction of "other bad acts" evidence is an exception to the common law rule prohibiting such evidence, and that our interpretation of how the exception is applied will be strict. Broom, supra,40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus. Although R.C. § 2945.59 and Evid.R. 404(B) do not set any minimum number of examples that are needed to show a criminal pattern, we would consider it the exception rather than the rule that a true behavioral fingerprint could be proven by comparing the crime to only one other similar event.
 {¶ 52} A review of the caselaw reveals the basic principle that the less similar the incidents being compared, and the more unreliable the facts surrounding the prior incidents, the more examples that are needed to allow other bad acts evidence to prove a behavioral fingerprint or modus operandi. See, e.g.,State v. McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046,837 N.E.2d 315 (two prior incidents could be compared to crime to show a common plan, as long as a clear jury instruction was given explaining the limited nature of the evidence); State v. Sapp,105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239 (three murders and attempted murders were compared); State v. Noling,98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88 (two prior robberies were compared with the crime); State v. Coley (2001),93 Ohio St.3d 253, 754 N.E.2d 1129 (two different instances of kidnapping, robbery, and attempted murder were "remarkably" similar as to establish modus operandi); State v. Green (2000),90 Ohio St.3d 352, 738 N.E.2d 1208 (no question existed as to whether defendant committed the prior similar crime, since he pleaded guilty to it, so it was admitted to establish a modus operandi); State v. Bey (1999), 85 Ohio St.3d 487,709 N.E.2d 484 (two practically identical homicides could be used to establish a modus operandi, particularly when the defendant admitted the prior homicide); State v. Pearson (1998),130 Ohio App.3d 577, 720 N.E.2d 924 (three "other bad acts" witnesses were permitted to testify at trial to establish identity). This list is far from complete, but the point is that when the current crime is being compared to only one prior incident to establish modus operandi, the facts must be very reliable, the incidents must be very similar, and the jury instruction must be very clear, to overcome the basic prohibition against allowing other bad acts evidence.
 {¶ 53} In the instant case, only two events are being compared to establish modus operandi. The prior attack was not charged. In fact, the only evidence available to prove a crime was committed was that Donna Dripps said it happened. Supposedly Ms. Dripps' boyfriend called 911 after the incident, but he was not called to testify and no police report was entered into evidence.
 {¶ 54} As the trial court pointed out in the first trial, the evidence establishing the prior attack was relatively weak. In addition, we agree with Appellant that there are some significant dissimilarities between the two crimes, and that very few aspects of the two crimes can even be compared. Donna Dripps was allegedly carried to a bedroom, choked for 20 minutes with Appellant's bare hands, and fondled and bitten on the breast by Appellant, who then fell asleep. Amber was strangled by some type of wire, was left naked by the front door, was bitten on the breast, but also suffered numerous other bruises and wounds. The clear dramatic similarity is the bite on the breast. Yet, the way the two victims were strangled is quite dissimilar. Donna Dripps was choked by Appellant's bare hands, whereas Amber was strangled to death by a cord. The general context of the crimes appears to be somewhat dissimilar. Donna Dripps testified that there were two other people asleep in other bedrooms in the apartment when she was attacked, whereas Amber was apparently murdered when she was alone. That no other sexual crime occurred in the course of either attack may be a similarity, but the fact that Donna Dripps was left partially or mostly clothed, while Amber was found naked, is a significant difference. Amber also sustained other injuries that do not appear to be present in the Donna Dripps incident.
 {¶ 55} Obviously some of the common elements of the two crimes, especially the bite on the breast, were bound to elicit an emotional reaction from the jury, but this emotional reaction is one of the key reasons for not allowing such evidence to be admitted. Curry, supra, 43 Ohio St.2d at 68.
 {¶ 56} We would further note that many of the details that Donna Dripps gave about her attack were by and large irrelevant to establishing a behavioral fingerprint, because there was no corresponding evidence arising from Amber's murder. We cannot know whether Amber's attacker attempted to kiss her, carried her to a bed, strangled her for twenty minutes, left her mostly clothed for some or all of the attack, fell asleep after the attack, or spoke profanities to her. Yet, Donna Dripps was permitted to testify to these and other details about her attack.
 {¶ 57} Ultimately, the record gives the appearance that Appellant was being tried for attacking Donna Dripps in addition to being tried for the murder of Amber Zurcher. The jury was essentially left to rely on the testimony of one person concerning an uncharged and only somewhat similar crime to provide a primarily emotional reason to link Appellant to the murder of Amber. Appellant may have indeed committed the murder, but he should have been tried on the facts of that murder, and not on the alleged facts of one prior uncharged event.
 {¶ 58} Third and finally, the trial court did not provide any limiting instructions to the jury when Donna Dripps testified, and gave only minimal (and somewhat confusing) instructions prior to jury deliberation. The trial judge told the jury: "The testimony of Donna Dripps may not be used to show the character of the defendant. It may only consider this testimony insofar as you believe it attempts to show that the defendant is the individual who committed this crime." (11/18/03 Tr., pp. 988-989.) This instruction is not entirely clear, and does not explain how the jury may properly consider Donna Dripps' testimony in light of the general prohibition against allowing the jury to consider evidence of other crimes or bad acts. The trial court is required to give clear instructions that will explain the narrow purpose for which other bad acts evidence may be considered by the jury. State v. Brown, 100 Ohio St.3d 51,2003-Ohio-5059, 796 N.E.2d 506, ¶ 24. Although the trial court has considerable discretion in accomplishing this task, the facts of this case certainly warranted more instructions than were provided by the trial court.
 {¶ 59} Based on all the factors mentioned above, we hold that the trial court abused its discretion in allowing Donna Dripps to testify. No one factor proves dispositive in this matter. It is the overall combination of factors that leads us to conclude that the introduction of the facts surrounding the attack on Donna Dripps resulted in an unfair trial, particularly when those same facts caused the trial court to declare a mistrial in the first trial.
B. The testimony of Bradley Windle.
 {¶ 60} Appellant's second argument under this assignment of error is that the trial court should not have allowed Appellant's probation officer, Brad Windle, to testify. This argument is also based on Evid.R. 404 and R.C. § 2945.59, which prohibit other bad acts to be introduced into evidence to prove the bad character of the accused.
 {¶ 61} Generally, until a criminal defendant has offered evidence of his or her good character, the state may not offer evidence of the defendant's bad character:
 {¶ 62} "In a criminal prosecution, until a defendant offers evidence of his general good character or reputation, the state may not offer testimony of his bad character or bad reputation; nor may collateral particular facts be shown for the purpose of injuriously affecting his character or reputation." State v.Cochrane (1949), 151 Ohio St. 128, 84 N.E.2d 742, paragraph three of the syllabus.
 {¶ 63} Furthermore, the state may not introduce evidence for the primary purpose of generally identifying the defendant as a criminal. For example, in State v. Breedlove (1971),26 Ohio St.2d 178, 271 N.E.2d 238, the state had attempted to introduce mug shots with police identification numbers, and the Ohio Supreme Court concluded that, "we believe it unjustifiable for the state, on direct examination, to present police mug shots, bearing police identification numbers, from which a reasonable inference can be drawn that the defendant, at some indefinite time in the past had had trouble with the law." Id. at 184.
 {¶ 64} The Ohio Supreme Court has also held:
 {¶ 65} "Generally, the introduction of evidence indicating that a defendant committed another crime similar in character, but wholly independent of the offense for which he is being tried, is prohibited. The admission of such evidence is extremely prejudicial because `[t]he average individual is prone to much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime.' State v. Hector, supra,
[19 Ohio St.2d] at 174-175, 48 O.O.2d at 204, 249 N.E.2d at 916-917. Thus, we have held that the introduction of evidence of prior unrelated crimes is reversible error.
 {¶ 66} "Instructions to the jury to disregard testimony of a prior offense are insufficient to overcome the prejudicial effect of such inadmissible evidence. `"* * * [T]oo often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell."' Bruton v. United States (1968), 391 U.S. 123, 129,88 S.Ct. 1620, 1624, 20 L.Ed.2d 476." (Some citations omitted.)Zuern, supra, 32 Ohio St.3d at 68, 512 N.E.2d 585.
 {¶ 67} In the instant case, Mr. Windle's testimony is the very type of evidence that places Appellant under a vague cloud of criminality without giving any context, and which can only be challenged by further emphasizing the prior crime.
 {¶ 68} The state's overall purpose in having Mr. Windle testify was to show that he was Appellant's probation officer, and that Appellant was subject to numerous conditions as part of his probation. At trial, the state argued that this testimony was necessary to prove that Appellant was not permitted to be at Super 8 Motel in Liberty Township, which is where the police arrested him. (11/18/03 Tr., p. 857.) When Appellant was arrested, it was discovered that the room was not registered in Appellant's name. This evidence could help to reinforce the inference that Appellant had a guilty conscience which led him to flee from arrest for Amber's murder and register in a motel under a false name. The state also argued that Mr. Windle's testimony would further show that Appellant violated numerous terms of his probation but failed to report them to Mr. Windle, lending to the inference that Appellant had a guilty state of mind. The trial court was apparently persuaded by these arguments and decided to allow Mr. Windle to testify.
 {¶ 69} At trial, Mr. Windle stated that the terms of Appellant's probation prohibited him from consuming alcoholic beverages, being around illegal drugs, and frequenting liquor establishments. In addition, if Appellant was questioned by the police about any matter, he was required to report this to Mr. Windle. Other evidence introduced at trial established that Appellant was at Chipper's Bar on the night of the crime, was consuming alcohol, was in the presence of illegal substances such as marijuana, and was questioned by the Austintown Police about the murder. Mr. Windle testified that Appellant never reported any of these facts.
 {¶ 70} Appellant argues that Mr. Windle should not have been permitted to testify because his very identity as a probation officer constituted the introduction of other bad acts evidence, namely, that Appellant had been convicted of an unnamed crime. Appellant further contends that Mr. Windle's testimony did not fit into any of the Evid.R. 404(B) exceptions to the general rule against allowing other bad acts evidence.
 {¶ 71} Appellee has failed to address this part of Appellant's first assignment of error, and thus, there are no particular rebuttal arguments. During oral argument on appeal, Appellee in fact was forced to admit that the state was treading on very thin ice with respect to its legal basis for calling Mr. Windle to testify.
 {¶ 72} As stated earlier, a trial court's rulings on the admissibility of evidence are reviewed for abuse of discretion.Martin, supra, 19 Ohio St.3d at 129, 483 N.E.2d 1157. As also explained above, other crimes and bad acts are generally not permitted at trial unless the evidence clearly falls into one of the exceptions listed in Evid.R. 404(B) or R.C. § 2945.59.
 {¶ 73} In State v. Cowans (1999), 87 Ohio St.3d 68,717 N.E.2d 298, the Ohio Supreme Court held that a parole officer may testify in the guilt phase of trial without violating Evid.R. 404(A) if the parole officer's status as a parole officer is inextricably linked to the state's presentation of its case:
 {¶ 74} "Moreover, Cowans's status as a parolee was relevant in the guilt phase, even though the nature of his previous crime was not. Higgins [the parole officer] searched Cowans's house and found property that had been stolen from Mrs. Swart. Higgins was able to search Cowans's house because she was his parole officer. Without knowing her relationship to Cowans, the jury could not have understood why Higgins was searching Cowans's house. Thus, Higgins's position as Cowans's parole officer was, as the trial court put it, `inextricably intertwined' with her testimony about the search." (Citations omitted.) Id. at 78.
 {¶ 75} In the instant case, the prosecutor agreed prior to trial that Mr. Windle would not mention the crime for which Appellant was on probation, but that he would reveal his status as a probation officer and that he supervised Appellant's probation. (11/18/03 Tr., pp. 859-860.) It is clear that Mr. Windle would have needed to reveal his status as probation officer in order to make sense of his testimony about various probation violations. What is unclear is how the litany of probation violations was relevant to this case.
 {¶ 76} Although Appellee has not responded to this part of Appellant's argument, we can presume that Mr. Windle was supposed to provide evidence to establish Appellant's criminal intent to kill Amber. This is what Appellee had argued prior to and during trial. Evid.R 404(B) does allow other bad acts evidence to prove intent, but this refers to intent to commit the crime that is being prosecuted rather than a generally guilty state of mind. For example, State v. Brown, 8th Dist. No. 84059,2004-Ohio-6862, involved a murder trial in which the trial court allowed Douglas Lloyd to testify that he and the defendant had previously planned a robbery, but that Mr. Lloyd backed out of the plan when he learned that the defendant also intended to murder the victim. The Eighth District held that the trial court's ruling did not violate Evid.R. 404 because it related to the defendant's intent to commit the crime for which he was being tried, which was murder. Id. at ¶ 33.
 {¶ 77} Assuming that Mr. Windle's testimony did show that Appellant had a guilty conscience about going to Chipper's Bar, about drinking alcoholic beverages, and about being in the presence of illegal drugs, these things have nothing to do with his criminal state of mind regarding the murder of Amber. It may show that he was afraid of being prosecuted for probation violations, but he was not on trial for probation violations. If probation officers were permitted to testify in criminal trials simply because probation violations occurred, then the state could bypass the general prohibition against other bad acts evidence in nearly every case where the defendant was on probation and committed a crime during probation. Any criminal defendant who is accused of committing a crime while on probation, and who then failed to tell the probation officer, would basically lose the protection of Evid.R. 404(A). One would suspect that most defendants on probation do not immediately tell their probation officer that they are suspected of committing a crime, or that they have actually committed a crime. The very act of committing any crime would typically be a probation violation, and thus, under Appellee's logic, the probation officer would be able to testify that the defendant has a guilty mind because he did not report the suspected crime to the probation officer. The jury would then know that the defendant had committed a prior crime and was on probation for that prior crime. This type of logic completely defies the rules concerning other bad acts evidence. See Broom, supra, 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.
 {¶ 78} The only aspects of Mr. Windle's testimony that might relate to the murder are the fact that Appellant failed to tell Windle that he was questioned by police about the murder, and the fact that he was not permitted to stay anywhere but in the residences that were on file with the parole officer, which did not include the Super 8 Motel in Liberty Township. Even if we assume that there were one or two aspects of Mr. Windle's testimony that fit into some exception listed under Evid.R. 404(B), that does not excuse the array of inadmissible character evidence he presented to portray Appellant as a criminal who violated basic terms of his probation and had a generally guilty state of mind because he hid the violations from his probation officer.
 {¶ 79} There is no rebuttal argument from Appellee, and we are persuaded by Appellant's argument that Mr. Windle's testimony violated the general rule against other bad acts evidence. Therefore, Appellant has presented a second reason for sustaining this assignment of error.
C. Cumulative Error.
 {¶ 80} At oral argument, Appellant raised the possibility that the combined effect of the aforementioned errors might constitute cumulative error in this case. The cumulative error doctrine refers to a situation in which the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial. State v. Madrigal (2000),87 Ohio St.3d 378, 397, 721 N.E.2d 52; see also, State v.DeMarco (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256. To affirm a conviction in spite of multiple errors, we must determine that the cumulative effect of the errors is harmless beyond a reasonable doubt. DeMarco, 31 Ohio St.3d at 195,31 OBR 390, 509 N.E.2d 1256. The errors may be considered harmless if there is overwhelming evidence of guilt, if Appellant's substantial rights were not affected, or if there are other indicia that the errors did not contribute to the conviction. Crim.R. 52(A); Evid.R. 103(A); State v. Martin,103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 51.
 {¶ 81} Obviously, the state presented some very strong evidence against Appellant, even excluding Donna Dripps' testimony and disregarding the damage done to Appellant's character by Bradley Windle. The DNA evidence, the scratches on Appellant's arms, his contact with the victim just minutes before the murder, are all very persuasive pieces of evidence. These facts show that he was with Amber on the morning of the murder, that he bit Amber and that she scratched him. Yet, the evidence does not show when the biting and the scratching occurred.
 {¶ 82} There was no dispute at trial that Appellant left Amber's apartment before the murder, and there was no direct evidence showing that he returned to Amber's apartment after he dropped off John Orosz and Sandy Shingleton. Appellant's counsel indicated during trial that he intended to show that the scratches and bite on Amber's breast occurred earlier in the evening and that he was not at Amber's apartment at the time the murder occurred. It is primarily the testimony from Donna Dripps that dramatically links Appellant to the crime, associating the DNA evidence with a prior act of strangulation and a prior act of biting a woman on the breast. It is clear that Appellant could have been convicted without Donna Dripps' testimony, but the ultimate question for our purposes is whether there was a fair trial in spite of the errors.
 {¶ 83} The trial court's decision to allow Bradley Windle to testify about an unspecified prior crime and about multiple probation violations further prejudiced Appellant. Not only did it label Appellant as an unspecified criminal who generally violated the terms of his probation, it also provided a partial justification for the court to give a flight instruction, which will be further reviewed under Appellant's third assignment of error. The flight instruction was related to the fact that Appellant was arrested at a Super 8 Motel in Liberty Township, just north of Youngstown, and that the room was not registered in Appellant's name. It is unlikely that a flight instruction would have been appropriate without the testimony of Mr. Windle, because the Super 8 Motel in which Appellant was found was not particularly distant from the scene of the crime or from Appellant's home. Mr. Windle's testimony is the key link in support of a flight instruction, and yet, Appellee has given us no particular arguments explaining why it was appropriate for Mr. Windle to testify. Based on the arguments made in this appeal, Mr. Windle should not have testified at all, and his testimony affected both the flight instruction and the overall innuendo concerning Appellant's bad character. Although it does not appear that Mr. Windle's testimony would constitute reversible error in and of itself, the testimony undoubtedly contributed to the unfairness of the trial.
 {¶ 84} After Donna Dripps and Bradley Windle testified, Appellant provided no defense at all to the murder charge. Counsel's original trial strategy appears to have been seriously altered or abandoned, in large part, due to the trial court's decision to allow these witnesses to testify and due to the extensive, largely irrelevant, and highly prejudicial nature of their testimony. Thus, it would seem that this case might have been tried quite differently if Donna Dripps and Bradley Windle had not testified. The record leads us to conclude that Appellant would likely have presented a different defense if he were only defending himself against the murder charge, rather than also defending against Donna Dripps' charges and Bradley Windle's innuendo. For these reasons, there does appear to be a prejudicial effect from the cumulative errors involving the testimony of Donna Dripps and Bradley Windle.
 {¶ 85} Based on all these considerations, Appellant's first assignment of error is sustained.
 ASSIGNMENT OF ERROR NO. 2 {¶ 86} "THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY APPELLANT'S TRIAL COUNSEL INDICATING TO THE JURY DURING OPENING STATEMENTS THAT THEY WOULD PROVIDE AN ALIBI DEFENSE ON BEHALF OF APPELLANT, THEN RESTING THEIR CASE WITHOUT PRESENTATION OF ANY ALIBI WITNESSES."
 {¶ 87} Appellant argues that his counsel was ineffective for announcing in his opening statement that alibi witnesses would be called, and then failing to call any alibi witnesses. To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense.Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674; accord State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. In order to show deficient performance, defendant must prove that his counsel's performance fell below an objective level of reasonable representation. Bradley at 142. To show prejudice, defendant must show a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different. Id. at 143.
 {¶ 88} The record reflects that Appellant's counsel informed the jury that they would hear testimony from two alibi witnesses, namely, Appellant's mother and her boyfriend. (11/18/03 Tr., p. 362.) They were apparently going to testify that Appellant arrived at his mother's house no later than 3:20 a.m. (11/18/03 Tr., p. 362.) It is clear from the record that no alibi witnesses were called, because Appellant did not present any witnesses in his defense.
 {¶ 89} As Appellee points out, it is generally presumed that the tactical decision of calling or refusing to call witnesses will not sustain a claim of ineffective assistance of counsel.State v. Coulter (1992), 75 Ohio App.3d 219, 230,598 N.E.2d 1324; State v. Williams (1991), 74 Ohio App.3d 686, 695,600 N.E.2d 298. The error alleged in this assignment of error, though, is in telling the jury that witnesses would be called, and then failing to call them or otherwise explain their absence. Appellant does not cite any appropriate caselaw to explain why this type of error would constitute ineffective assistance. The one case cited by Appellant, Middletown v. Allen (1989),63 Ohio App.3d 443, 579 N.E.2d 254, deals with the problem of trial counsel failing to subpoena alibi witnesses, which is not the error that Appellant is alleging.
 {¶ 90} The record reveals that Appellant and his counsel made a clear decision to rest their case without calling any witnesses:
 {¶ 91} "THE COURT: I think you need to perhaps have Mr. Anderson state something on the record as far as acknowledging your presentation.
 {¶ 92} "MR. YARWOOD: Well, he can indicate in the affirmative that it was his understanding that we were not calling any witnesses on his behalf and that he was not going to testify. Other than that, I don't believe that anything else would be necessary except for the fact that he consulted with us prior to that decision being made and it wasn't a decision made strictly by trial counsel or co-counsel for that matter. It was a decision that involved all three of us.
 {¶ 93} "* * *
 {¶ 94} "THE COURT: Okay. Why don't you bring him up here.
 {¶ 95} Mr. Anderson, you have rested your case, and you have not presented any evidence. It's certainly a right that you have. You have a right not to testify. I want to make it clear that you do understand that you have the right to present evidence, and you do have the right to testify, if you so desire. You don't have to. Do you understand all of that?
 {¶ 96} "DEFENDANT ANDERSON: Yes, sir.
 {¶ 97} "THE COURT: It's your desire to proceed in the manner that the lawyers have presented the case this afternoon?
 {¶ 98} "DEFENDANT ANDERSON: Yes, sir.
 {¶ 99} "THE COURT: Okay. You are satisfied with their representation of you?
 {¶ 100} "DEFENDANT ANDERSON: Yes, sir." (11/18/03 Tr., pp. 892-893.)
 {¶ 101} Appellant has not argued that his waiver of the right to present witnesses in his favor was made unknowingly or involuntarily. Although it is rare, there are instances in which it may be a sound trial strategy to discuss alibi witnesses in the opening statement and then refuse to call those witnesses. InState v. Rodgers, 6th Dist. No. l-02-1089, defense counsel discussed two alibi witnesses in his opening statement. The first witness called failed to actually present an alibi. Counsel then decided not to call the other witness. These decisions by trial counsel were deemed to have been sound trial strategy and not ineffective assistance of counsel. In State v. Carter, 5th Dist. No. 2002CA00125, the trial court stated that the defendant's father would be called as an alibi witness, but he was not called. During the state's presentation of evidence, an officer mentioned that he had spoken with the defendant's father, and that the father said that his son did not commit the crime. After these comments, there did not appear to be a reason to call the father to testify. Under these facts, no ineffective assistance of counsel was found in failing to call the alibi witness.
 {¶ 102} It is not difficult to see the benefit that Appellant could have received from refusing to call the two alibi witnesses. Counsel stated in his opening argument that the alibi witnesses would testify that Appellant arrived at this mother's house at 3:20 a.m. Yet, John Orosz, who was Amber's stepbrother, testified that he and Appellant were the last people to leave Amber's apartment on the morning of the murder, and that they left just before 4:00 a.m. (11/18/03 Tr., pp. 407, 409.) Orosz originally was going to testify that he and Appellant left earlier, but his recollection changed during the course of his testimony. (11/18/03 Tr., p. 408.) Thus, there would have been a significant credibility issue that would have arisen if Appellant's alibi witnesses were called to testify since Appellant's alibi would have been that he arrived at his mother's house 40 minutes before he even left Amber's apartment.
 {¶ 103} It is also clear from the record that Appellant agreed to this trial strategy. Since it is presumed that trial tactics are within the broad range of acceptable representation, and there is no reason to question this strategy based on the facts of the case, Appellant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. 3 {¶ 104} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY ERRONEOUSLY GIVING A FLIGHT INSTRUCTION TO THE JURY WHEN THE EVIDENCE ADDUCED AT TRIAL DID NOT SUBSTANTIATE THE INSTRUCTION."
 {¶ 105} Appellant argues that the trial judge should not have given the jury a "flight instruction" because the facts do not support the conclusion that he fled the scene of the crime or fled prior to being arrested. The actual instruction given by the trial judge is as follows:
 {¶ 106} "In this case there was evidence that the defendant fled from the area immediately following the search of his residence. Fleeing from the vicinity of a crime does not in and of itself raise a presumption of guilt or a guilty connection with the crime. That is, you are instructed that you may not presume the defendant guilty from such evidence. You may, however, infer a consciousness of guilt regarding the evidence of the defendant's alleged flight." (11/18/03 Tr., pp. 987-988.)
 {¶ 107} The Ohio Supreme Court has repeatedly held: "`It is to-day universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' 2 Wigmore on Evidence (3 Ed.), 111, Section 276, and cases cited." State v. Eaton (1969), 19 Ohio St.2d 145, 160,48 O.O.2d 188, 249 N.E.2d 897, vacated on other grounds (1972),408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750; holding reaffirmed byState v. Williams (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646.
 {¶ 108} A flight instruction is treated as part of the overall jury instructions and is reviewed in the context of the entire jury instructions. State v. Price (1979),60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. A trial court is required to give the jury all instructions that are relevant and necessary for the jury to weigh the evidence and fulfill its duty as the factfinder. Statev. Comen (1990), 50 Ohio St.3d 206, 210, 553 N.E.2d 640.
 {¶ 109} Where a timely objection has been made to the jury instructions pursuant to Crim.R. 30, a reviewing court will not reverse the trial court's decision relating to whether sufficient facts existed to support a jury instruction absent an abuse of discretion. State v. Endicott (1994), 99 Ohio App.3d 688, 693,651 N.E.2d 1024. The record indicates that Appellant's counsel did present a timely objection to the flight instruction. (11/18/03 Tr., p. 898.) Thus, we will examine whether the trial court's flight instruction constituted an abuse of discretion.
 {¶ 110} The flight instruction given by the trial court in this case is similar to the type of instruction that has regularly been upheld by this Court. See, e.g., State v. Green,
7th Dist. No. 01 CA 54, 2003-Ohio-3074; State v. Wright, 7th Dist. No. 03 MA 112, 2004-Ohio-6802.
 {¶ 111} A flight instruction is applicable not only for flight immediately after the crime, but also for flight from subsequent arrest. Eaton, supra, 19 Ohio St.2d at 160. The evidence showed that detectives searched Appellant's home on August 20, 2003, but did not have an arrest warrant at that time. A short time later an arrest warrant was issued. The police tried to contact Appellant by phone and they went to his house, but he could not be found. (11/18/03 Tr., p. 611.) They received an anonymous tip that Appellant could be found at the Super 8 Motel in Liberty Township, just north of Youngstown. (11/18/03 Tr., p. 612.) On August 22, 2003, the police found Appellant at the hotel, but registered under another name. (11/18/03 Tr., p. 614.) The police arrested him.
 {¶ 112} It is unlikely that this evidence, by itself, would justify a flight instruction. The room was registered in the name of Christina Kerchak, and she was present in the room at the time of the arrest. The motel was not particularly far from the scene of the murder, from Appellant's home, or from the investigation of this case.
 {¶ 113} There is further evidence, though, that may support the flight instruction. As earlier discussed, the prosecution produced the testimony of Bradley Windle, Appellant's probation officer, who indicated that Appellant was not permitted to be at the Super 8 Motel in Liberty Township, and did not report his stay at the motel to Mr. Windle. This additional evidence could justify a flight instruction, in that it established that Appellant had to leave the jurisdiction prescribed by the terms of his probation in order to reside in the Super 8 Motel, and that he had a guilty mind by not telling his probation officer about staying at the motel. Although the record contains other evidence that Appellant points to that might indicate that he did not flee from arrest, this goes to the weight and credibility of the evidence rather than addressing whether there was sufficient evidence to warrant a flight instruction.
 {¶ 114} We are assuming at this point that the testimony of Bradley Windle was considered by the trial court as part of the rationale for giving a flight instruction. We have noted, as part of Appellant's first assignment of error, that Bradley Windle should not have testified concerning a number of probation violations, and that Appellee has failed to provide on appeal any particular reasons to justify any of Bradley Windle's testimony. Thus, in light of our analysis of assignment of error number one, it appears that the flight instruction would not have been appropriate. Rather than determine whether any error surrounding the flight instruction constitutes reversible error in and of itself, we simply conclude that the weak basis for the flight instruction, particularly in light of Bradley Windle's inappropriate testimony, is part of the cumulative error in this case as earlier discussed. Therefore, we sustain Appellant's third assignment of error as it relates to the assertion that cumulative error occurred.
 ASSIGNMENT OF ERROR NO. 4 {¶ 115} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTION FOR MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."
 {¶ 116} The issue as to whether a trial court's judgment is against the manifest weight of the evidence was addressed extensively in State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541:
 {¶ 117} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credibleevidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief.'" (Emphasis in original.) Id. at 387, 678 N.E.2d at 546, quoting Black's Law Dictionary (6 Ed. 1990) 1594.
 {¶ 118} When reviewing a trial court's decision on manifest weight of the evidence, a court of appeals acts as a "thirteenth juror," especially when it reviews the trial court's resolution of conflicts in testimony. Id., citing Tibbs v. Florida (1982),457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.
 {¶ 119} Thompkins also held that:
 {¶ 120} "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.
 {¶ 121} Based on our disposition of assignment of error number one, a full evaluation of the manifest weight of the evidence would ultimately result in a certain amount of speculation on our part. Obviously, the state presented very strong evidence against Appellant even apart from the testimony of Donna Dripps and Bradley Windle. What we cannot know is how the trial would have proceeded, and how the jury would have ultimately responded, if the testimony of those two witnesses had been excluded from the trial. The fundamental unfairness of the trial is not that the state had too little evidence to support a conviction, but rather, that the entire nature of the trial was affected by the improper testimony of Donna Dripps and Bradley Windle. Furthermore, since we are reversing Appellant's conviction due to the prejudicial nature of the improper testimony, any further discussion of the manifest weight of the evidence would be largely irrelevant to the outcome of this appeal, and thus, we overrule this assignment of error as being moot.
 ASSIGNMENT OF ERROR NO. 5 {¶ 122} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY PROHIBITING TRIAL COUNSEL FROM CROSS-EXAMINING APPELLEE'S WITNESS, JOHN OROSZ, RELATIVE TO HIS CREDIBILITY AND VERACITY INVOLVING A PLEA AGREEMENT FOR A DRUG CHARGE AND DRUG USAGE AND DEALING ON THE NIGHT IN QUESTION."
 {¶ 123} Appellant argues that he was not permitted to fully cross-examine witness John Orosz, who gave considerable testimony about the timing of the events on the morning of the murder. Orosz is a close friend of the victim and was raised with her, although he is not legally related to her. (11/18/03 Tr., p. 397.) At the time of the murder, he owned a pizza shop near Chipper's Bar. He was in and out of the bar preparing and delivering pizzas while Amber was there. After the bar closed, he joined the group that went to Amber's apartment. He also left her apartment for a short time to go to his pizza shop. He returned, and was among the last people to leave the apartment before Amber was murdered.
 {¶ 124} During Orosz's testimony, there was an extended sidebar in which Appellant's counsel requested that he be permitted to ask Orosz questions about a possible drug deal on the morning of the murder. By the time this sidebar took place, Orosz had already testified that he had a prior drug conviction and had been on probation for three years. Appellant's counsel wanted to ask Orosz about a possible drug deal with a man named John Mendez. Orosz had spoken to Mendez on the phone in Amber's apartment on the morning of the murder. The trial court did not allow Appellant's counsel to ask any questions about drug dealing, but did permit questions dealing with Orosz's drug use. After the sidebar, Appellant's counsel asked Orosz a few more questions about drug usage. (5/27/03 Tr., pp. 446-447.)
 {¶ 125} Appellant argues that, under Evid.R. 608, he was permitted during cross-examination to impeach Orosz using specific instances of conduct, including the alleged drug deal. Although Evid.R. 608(B) provides that a witness may be impeached on cross-examination by reference to specific instances of bad conduct, it is within the discretion of the court to allow or prevent such questioning. State v. Kamel (1984),12 Ohio St.3d 306, 310-311, 12 OBR 378, 466 N.E.2d 860. Since there was no evidence of any drug deal in the record, the trial judge refused to allow counsel to imply such a fact through the guise of impeachment. There does not appear to be any abuse of discretion in disallowing a question that has no basis in fact.
 {¶ 126} Appellant contends, though, that both Orosz and Mendez were under indictment for drug trafficking. Appellant argues that he should have been permitted to ask Orosz if he had entered into a plea bargain relating to the drug trafficking charges. Appellant maintains that he should have been permitted to develop his theory of the crime, which was that the unidentified third person's DNA found under Amber's fingernails was the murderer, and that this third person had something to do with a failed drug deal. This entire theory was completely speculative, though, and there were no indications from Appellant's counsel that he could provide any evidence to support the theory.
 {¶ 127} A witness may be impeached by evidence of criminal conviction under Evid.R. 609, or by evidence of the witness's character for untruthfulness under Evid.R. 608(B). A witness's credibility may not be impeached with evidence of general bad moral character, but may be impeached by evidence that shows a general character for untruthfulness. State v. Shields (1984),15 Ohio App.3d 112, 113, 472 N.E.2d 1110. Since there was nothing in the record concerning this alleged drug deal, Appellant's only reason for asking a question about it would be to raise general character issues concerning Orosz based on supposed criminal activity that has not yet resulted in a conviction. Appellant's counsel was obviously attempting to raise an issue about a pending criminal case, after which Orosz would exert hisFifth Amendment right not to incriminate himself, thus leaving a general impression that Orosz wanted to hide criminal activities. The purpose of such an inference would be to show that Orosz could not be trusted. This is the very approach that is not permitted under Evid.R. 608 and 609, and the trial judge was correct in excluding this line of questioning. See State v.Rodriquez (1986), 31 Ohio App.3d 174, 176, 509 N.E.2d 952. "Criminal activities not resulting in conviction cannot ordinarily form the basis for an attack upon a witness's credibility." State v. Skatzes, 2nd Dist. No. 15848, 2003-Ohio-516, at ¶ 183. Therefore, Appellant's fifth assignment of error is overruled.
 CONCLUSIONS {¶ 128} Based on the unusual circumstances that occurred in this case, Appellant's first and third assignments of error are sustained on grounds of cumulative error. Assignment of error number four must be declared moot. The other two assignments of error do not have merit. Appellant's conviction is hereby reversed and the case is remanded to the Mahoning County Court of Common Pleas for further proceedings consistent with this Opinion.
Donofrio, P.J., concurs.
Vukovich, J., dissents; see dissenting opinion.