[Cite as *State v. Stevens*, 2023-Ohio-4683.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-21-1219

　　　　Appellee                                      Trial Court No.  CR0202001186

v.

Ronald Stevens                                        **DECISION AND JUDGMENT**

　　　　Appellant                                      Decided:  December 21, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

William L. Burton, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} Appellant, Ronald Stevens, appeals from the judgment of the Lucas County
Court of Common Pleas, convicting him of multiple sex offenses against six minor
students of a local school district.  For the reasons that follow, the trial court's judgment
is affirmed.

## Statement of the Case

{¶ 2} On January 31, 2020, appellant was charged in a 32-count indictment with nine counts of rape, in violation of R.C. 2907.02(A)(2) and (B); six counts of sexual battery, in violation of R.C. 2907.03(A)(7) and (B); 12 counts of gross sexual imposition, in violation of R.C. 2907.05(A)(1) and (C); and five counts of pandering obscenity involving a minor, in violation of R.C. 2907.321(A)(5) and (C).

{¶ 3} On December 17, 2020, the state served supplemental discovery related to several electronic devices, including a cell phone belonging to "Victim #1" (victim "T.S."). The prosecutor noted that T.S.'s phone would be "available to review at the prosecutor's office."

{¶ 4} On January 5, 2021, defense counsel filed a motion to compel discovery "as it concerns the phone of alleged victim #1." The motion, which sought "the information of the alleged victim's phone," argued that the prosecution had "only made the alleged victim's phone available to view at the prosecutor's office," which was an arrangement that "[did] not permit the Defendant to review the discovery and prepare a defense." The state treated the motion as one seeking access to the full forensic extraction of the victim's cell phone and opposed it.

## February 2, 2021 Pretrial Conference

{¶ 5} In a pretrial conference held on February 2, 2021, the parties discussed the motion to compel and clarified that the motion related to the second of two phones that

2.

were possessed by T.S. It was undisputed that T.S. used the first phone prior to the indictment in this case, and the second, after the indictment.

{¶ 6} During the pretrial conference, the prosecutor explained that the victim gave his first phone, by consent, to investigating officers and then Sylvania police downloaded the information that was contained on the phone. The prosecutor further explained that "at some point during the transfer from the downloaded extraction to the server or the hard drive where Sylvania stores this stuff something happened where that was corrupted or not saved properly and so that information doesn't exist." Following the data transfer failure, the state attempted to retrieve the phone, which had since been returned to T.S. At that point, it was discovered that the phone was severely damaged and, as a consequence of that damage, information could no longer be recovered from the device. In the meantime, T.S. had obtained a second phone.

{¶ 7} The prosecutor stated that information from the second phone was downloaded and extracted, but that the defense "[had] not made a plausible showing" that there was anything "material to the indictment or exculpatory" in the information recovered from a phone that had been acquired after appellant was incarcerated. The prosecutor further stated that he was not intending to use any information obtained from the second phone in his case in chief, and that during his cursory review of the phone he did not see any communications between appellant and the victim.

3.

{¶ 8} Following the state's comments, defense counsel requested a determination as to whether information from the first phone was contained in cloud storage for the second phone. Responding to defense counsel's request, the trial court ordered the state to "endeavor to ascertain" whether the information from the first phone was contained in the Cloud or in any other digital archive. The prosecutor agreed to "ask the question" of Sylvania police, but also pointed out that appellant himself had two cell phones -- one of which was taken during the investigation and another that was taken after the arrest warrant was issued -- that both phones, in their entirety, had been provided to defense counsel in discovery, and that any communication between appellant and T.S. "should have been or would have been" on the phones.

**May 25, 2021 Pretrial Conference**

{¶ 9} At a subsequent pretrial conference held on May 25, 2021, the prosecutor mentioned that there was "additional electronic information" available for defense counsel to review in the prosecutor's office, including "some iCloud data" and "some other data" from the victim's phone -- none of which the prosecutor believed to be relevant. Defense counsel stated that he had not yet had an opportunity to review the data -- and so he had not made his own determination as to whether it contained exculpatory evidence -- but that he would discuss the matter with his co-counsel and would likely talk to the prosecutor sometime during the next week.

4.

## Trial

{¶ 10} Trial in the case began on September 14, 2021. Notwithstanding the discussion of the phones that took place during the pretrial conferences, during the cross-examination of T.S.'s mother regarding T.S.'s disclosure of abuse by way of a note typed into his (first) phone, defense counsel objected on the grounds that he had never seen the note. Specifically, defense counsel stated that destruction of the phone was "destruction of potentially exculpatory evidence" and, on that basis, defense counsel moved for dismissal of the case. The trial court denied the motion, stating that the matter should have been raised before trial. Upon further cross-examination, T.S.'s mother clarified that the note was not contained in T.S.'s phone messages; rather it was typed into the notepad application on his phone. She also testified that she did not know whether the note could still be seen on the phone when it was initially given to police.

{¶ 11} At the conclusion of the case, the jury found appellant guilty of nine counts of rape, six counts of sexual battery, 11 counts of gross sexual imposition, and three counts of pandering in obscenity involving a minor. The trial court imposed consecutive prison sentences for each count, with an aggregate minimum term of 101 years and a maximum aggregate term of 104 years and six months.

5.

## Statement of Facts

## The Evidence at Trial

## Darcy Browne

{¶ 12} Darcy Browne, the assistant principal of the Ottawa Hills junior and senior high schools, testified that the Ottawa Hills is recognized as a public school district in the state of Ohio. She testified that appellant had been employed at Ottawa Hills Schools ("the school"), most recently as the director of operations, but before that as an employee in the accounts payable department, and before that, as a custodian. She characterized appellant as friendly, helpful, and easy to work with. She testified that he resided in the Village of Ottawa Hills, that his wife, Kristie Stevens, worked at the school, and that his children were students in the school.

{¶ 13} According to Browne, appellant had master keys that allowed him to enter the school at any time of the day or night, even when it was closed to students. He had two offices, one in the high school, in a tunnel near the locker room, and one off of the gym in the elementary school. The school's security system included cameras that were located in the halls and by the main entrances. Browne commented that appellant was good with electronics.

{¶ 14} On November 19, 2019, victim T.S., an Ottawa Hills student, returned to the school after he was hospitalized following a suicide attempt. When he returned, his parent requested that appellant not have any contact with T.S.

6.

{¶ 15} Several weeks later, on December 10, 2019, T.S. came into the school office. Browne testified that T.S., who was normally "stoic" and "not really emotional," was visibly upset and crying. When Browne asked him what was wrong, T.S. could not articulate an answer but told Browne, "[C]all my mom, she knows." T.S. subsequently disclosed that he was upset because appellant approached him at school and told him that he missed him. That same day, Children's Services called the school. As a result of that phone call, appellant was placed on administrative paid leave -- meaning that he was not permitted to be on school grounds or to be at school.

**Christopher Sargent**

{¶ 16} Christopher Sargent testified that in 2019 he was a police sergeant for the Village of Ottawa Hills. He stated that he knew appellant as a "good guy" who was generally liked in the community. Sargent was familiar with appellant's home address and knew that he drove a distinctive bright orange Dodge Ram. Sargent saw the truck in the driveway of T.S.'s house in the middle of the night on numerous occasions.

{¶ 17} After the investigation of T.S.'s statements began, appellant went missing for a period of time. Appellant's wife called the police department because appellant was not answering his phone and she did not know where he was. Sargent testified that he looked for the truck for a couple of hours, but did not locate it.

7.

**T.S.**

{¶ 18} T.S. was 15-years old and a student at Ottawa Hills when he met appellant. T.S. had no contact with his biological father, but T.S.'s brother, J.S., who had a different biological father, frequently spent weekends away with his father. T.S.'s mother often traveled for work and was often gone on the weekends so that T.S. was left alone. Appellant began to fill the void left by T.S.'s missing father. Appellant helped T.S. with his schoolwork. He came to the boy's house at all times of the day, including late at night and early morning. Appellant often entered T.S.'s house, using a pass code to the door, in order to wake the boy up for school. He provided meals for T.S., who often left the school to go to appellant's house for lunch. They worked on cars together. T.S. called appellant "Dad," and appellant called him "son." Appellant told T.S. that he loved him, and the two spent a lot of time together.

{¶ 19} T.S. testified that near the end of 2017, while T.S. was still 15, appellant began touching T.S.'s legs and penis and performing oral sex on him. T.S. stated that appellant performed oral sex on him at least 150 times to the point that the boy would ejaculate. He further stated that sexual encounters occurred in his bedroom at his house and at several locations in appellant's house, as well as in appellant's office in the elementary school gym and in appellant's office at the high school. Appellant also provided the boy with artificial vagina masturbation devices which T.S. called "pocket pussies." T.S. kept one in his bedroom at home, but he knew there was another one in

8.

appellant's bedroom closet. T.S. said that appellant masturbated while touching T.S., but never asked T.S. to do anything to him.

{¶ 20} T.S. stated that he communicated with appellant through Snapchat, a computer application which makes messages and photos available for only a short time before eventually rendering them inaccessible. Appellant asked T.S. to send videos and photos of himself masturbating to the point of ejaculation, and T.S. did so on at least 50 occasions.

{¶ 21} T.S. testified that the episodes of abuse made him upset, and that he told appellant not to do it, but appellant "would just keep going." Appellant eventually tried to kill himself, because he was not "feeling good" about himself.

{¶ 22} T.S. testified that appellant knew where his classes were. Describing an incident that occurred after he returned to school following his hospitalization, T.S. stated that he was headed to math class when he saw appellant standing where T.S. had to walk. Appellant said, "I miss you, Bud." T.S. went to the office, crying, because he wanted to go home, where he would not have to see appellant.

{¶ 23} The school's security video recordings depicted T.S. entering the school late that day and going to the office to get a late pass. He walked through the hallway to get to his classroom, but he testified that a shortcut existed through the gym. The video depicted appellant going through the gym, into the hall, so that T.S. had to walk past him in order to get into the classroom.

9.

{¶ 24} T.S. identified photos of appellant's bedroom, living room, basement, and a bedroom in the basement. He said that appellant had used "his hands and his mouth and the pocket pussy on [T.S.'s] penis" in appellant's bedroom. He said that appellant also used "hands, his mouth, and the pocket pussy on [T.S.]" while they were in the living room of the house, while they were in the basement living area, and while they were in the basement bedroom. He identified a photo of appellant's office at the elementary school with a blacked-out window, and said that appellant "would use his hands, his mouth, and the pocket pussy on me" in that office. He also identified photos of the high school locker room and the windowless office in the high school locker room, and said that appellant also "put his hands, his mouth, and the pocket pussy on me" in that office.

{¶ 25} T.S. identified a flash drive containing messages between himself and appellant. The messages had been taken from his iPad. He said he renamed appellant's contact as "Kyle Raul," because his mother did not want him talking to appellant. One message indicated that appellant wanted to use Snapchat. In 2019, appellant messaged T.S. "don't block me", and "unblock me." T.S. responded "fuck you" and "you never saw me as your son, you just wanted doing fucking shit." T.S. testified that "doing fucking shit" was a reference to "[w]hen [appellant] would put his hands and his mouth on [him]." A message exchange followed in which T.S. asserted that appellant did not care about him, and in which appellant responded that he loved T.S. and that it was T.S. who had asked appellant to leave.

10.

{¶ 26} T.S. had a girlfriend, H.S., from the time he was 16 until he was 18. Appellant seemed jealous of T.S.'s sexual activity with H.S., and the jealousy interfered with T.S.'s relationship with the girl. Text messages between appellant and T.S. revealed appellant's unusually strong interest in the teen's sexual relationship with his girlfriend. On April 16, 2019, T.S. messaged appellant, "I'm sorry, she left an hour ago," to which appellant replied "finish??" When T.S. answered no, appellant said "this fucking sucks." When T.S. indicated that he was going to bed, appellant replied with a frowny faced emoji and the words "I love you." T.S. said "I'm sorry, I love you too." On April 1, 2019, T.S. messaged that he was going to his girlfriend's, and appellant replied with a question mark. On April 8, appellant again texted "finish?" When T.S. replied no, appellant said "get to finish" and T.S. replied "no, I don't even really want to kiss her." T.S. said that "finish" referred to ejaculation, and that appellant frequently questioned him about his sexual activity with his girlfriend. Again, on April 7, appellant texted "did you get to finish" and when T.S. answered no, he responded "aww, I've been feeling bad, so you haven't since when?"

{¶ 27} A rape allegedly occurred at T.S.'s house on November 9, 2019, but T.S. was not at the house at that time. Other people were at the house having a party and drinking, and one of the females present said that something happened, so T.S. was interviewed by police. T.S. said that he was at his girlfriend's house that night and fell

asleep, and that when his girlfriend's father woke him up, he went to appellant's house, where he stayed for 30-40 minutes.

**M.S.**

{¶ 28} M.S. is the mother of T.S. and T.S.'s younger brother, J.S. She testified that T.S.'s father is not in his son's life, and that she considered appellant to be a friend after he "kind of took [T.S.] under his wing," tutoring him and helping him work on cars. Appellant was frequently at her house, and would just "show up" in the morning or night.

{¶ 29} M.S. testified that she was spending a good deal of time out of town taking care of her grandfather in Livonia, so it helped her to have appellant coming over in the morning and at night to check on her kids. Characterizing appellant as a trusted "family friend[]", she relied on him to the point where she signed a form allowing appellant to have access to T.S.'s school records during times that she was traveling or doing "anything else." In late 2018 and early 2019, she signed temporary custody agreements, which allowed Stevens to make both medical and school decisions for T.S. She revoked both of these agreements on December 10, 2019, the same date that the emotionally upset T.S. met with Browne.

{¶ 30} As M.S.'s commitments to her grandfather began to lessen, she became uncomfortable with appellant's relationship with T.S., especially when appellant would try to tell her how to discipline T.S. for such infractions as staying at his girlfriend's house too late at night. She began to try to limit the relationship with appellant.

12.

{¶ 31} In 2019, T.S. took a large amount of Motrin in an attempt to "go to sleep and not wake up." Appellant called M.S. every day during T.S.'s hospitalization, asking about T.S. and whether "he said anything." She believed appellant was just a concerned parent until she found messages to appellant's number, listed under a different contact name, on the iPad in T.S.'s room. She interpreted some of the messages as appellant asking inappropriate questions about whether T.S. had an orgasm with his girlfriend.

{¶ 32} M.S. testified that after T.S. was released from the hospital, he typed a note on his phone to the effect that appellant had been raping him since he was 15-years-old and then showed the note to M.S. Thereafter, M.S. requested a meeting with the school and asked that contact between appellant and her sons be restricted. She sought therapy for T.S., but she did not immediately notify police or the school of T.S.'s allegation. T.S.'s therapist reported the allegation.

### H.S.

{¶ 33} H.S. is T.S.'s former girlfriend. She testified that during her relationship with T.S., appellant "would lie to me about what [T.S.] was saying." She confirmed that appellant was over at T.S.'s house once or twice a week when they first started dating, and that the frequency of those visits decreased when T.S.'s mother said that she did not want appellant in T.S.'s life. She said that appellant would ask T.S. to stop by his house after leaving her. Appellant frequently asked where H.S. and T.S. were going, who they were with, and what they were doing, and T.S. often hid text messages that he received

13.

from appellant. H.S. confirmed that T.S. changed the contact name for appellant to "Kyle Raul" after T.S.'s mother tried to limit his contact with appellant.

{¶ 34} On November 13, 2019, T.S. and H.S. had an argument early in the day. When H.S. went to pick T.S. up later that night, she found that he was deeply asleep and hard to wake up. She found a pill bottle in his trash, so she called his mother and they took him to the hospital.

{¶ 35} During T.S.'s stay at the hospital, appellant kept asking H.S. about her boyfriend. T.S.'s mother had asked H.S. not to give appellant any information about what was going on with T.S., including how he was, and what was happening, but appellant continued to "text and call and Snapchat [H.S.] to try to figure out what was going on" even after H.S. asked him not to. After T.S. came home, he was not quite normal, and was "obviously struggling and he was definitely very odd" about appellant. He eventually showed H.S. a note on his phone indicating that appellant had been sexually abusing him since he was 15-years old. T.S. and H.S. subsequently showed the note to T.S.'s mother.

**Stacey Violi**

{¶ 36} Stacey Violi, a forensic scientist in the DNA section of the Bureau of Criminal Investigations, testified that swabs of the interior of the large and small caps of a sexual device from appellant's closet contained a mixture of DNA, the major

contributor to which was consistent with T.S. Additional DNA was present but was not suitable for a comparison.

**Shane Patacca**

{¶ 37} Shane Patacca testified that at the time of trial, he was the director of technology and operations at Ottawa Hills Schools. He testified that appellant was personable, well-liked, and generally nice, and that, as a result of his work duties, appellant had a master key to every building and classroom in the district. Patacca confirmed that there was blackout film over the window of appellant's office, so that people walking by could not see inside.

{¶ 38} Patacca testified that he took over appellant's position as director of operations. He stated that as director of technology, he oversees all of the technology infrastructure, including laptops and network, and that as director of operations, he oversees buildings, facilities and grounds. Patacca said that he is considered an administrator in the school, and that, in this position, he has met many of the students in the school. He further testified that the students are aware that he holds a position of authority in the school.

{¶ 39} Patacca testified as to the general placement of security cameras at the school. There were no cameras in appellant's office, the classrooms, the bathrooms, or the locker rooms. Cameras on the interior of the building were focused on doors to promote the security of students in the event of an active shooter on the campus.

15.

Cameras on the exterior faced doors, parking lots, and general facilities in order to deter vandalism or similar incidents. Because appellant had previously held Patacca's position, he would have known the locations of cameras and that video recordings were only stored for 20 days.

{¶ 40} Patacca authenticated a video recording from December 10, 2019, which depicted T.S. and appellant going into the school office at the same time and emerging at the same time less than a minute later.

### Det. Terry Cousino

{¶ 41} Det. Terry Cousino testified that he is an investigator with the Lucas County Prosecutor's Office. Referring to the December 10, 2019 video recording of T.S. and appellant, Cousino observed that at one point, appellant can be seen stopped in the school hallway, leaning against a locker, where he appeared to be waiting. Cousino further observed that appellant appeared to speak to T.S., who quickly glanced back but did not stop.

### R.H.

{¶ 42} Fifteen-year-old R.H. testified that appellant coached a baseball team that included himself; appellant's son, S.S.; another friend, B.B.; and T.S.'s brother, J.S. R.H.'s father traveled a great deal for work, and so appellant often drove R.H. to get food or to team practices. R.H. and appellant also rebuilt a go-kart together, and R.H. frequently slept over at appellant's house, along with S.S., BB., J.S. and other friends,

16.

including S.P. During those sleepovers, the boys would watch movies or play video games or play basketball at the school gym, which appellant accessed using his work key.

{¶ 43} When R.H. was playing sports, appellant would stretch R.H.'s legs, and when he was sleeping over at appellant's house, appellant would come downstairs and start stretching R.H. out, gradually getting closer to the boy's penis as he rubbed his legs. During the summer after R.H.'s seventh grade year, appellant began to stroke R.H.'s penis, usually while they were in the basement of appellant's home, although appellant sometimes told R.H. to go upstairs to the living room couch. R.H. became erect and ejaculated on about five occasions, causing him to be scared and not know what to do. Three or four times, appellant also put his mouth on the boy's penis until he ejaculated.

{¶ 44} Thinking he was the only victim, and not wanting to lose his friends, R.H. continued to go back for sleepovers and did not tell anyone about what was happening. He said that if his friend had done something similar to him, he would have pushed him away, but he did not feel that he could do that to appellant, because "[h]e's like an adult – I don't' know, just weird and scary."

{¶ 45} R.H. said that once when he was at appellant' house, appellant said, "[I]f you think you're going to tell anyone about what we've been doing, you better tell me first." He said that when T.S.'s story came out, he told T.S.'s girlfriend to thank T.S., because it helped him to come out and to end the abuse for himself as well.

**B.B.**

{¶ 46} Fifteen-year-old B.B. was also on the baseball team coached by appellant, along with S.S., who in addition to being appellant's son, was B.B.'s close friend. B.B. testified that he frequently spent the night in appellant's basement, and that appellant would stretch him after he went to bed. B.B. testified that appellant would "start with my legs and he would kind of like massage me up, and then he would ask me a question, like do I want it higher or lower, and then it would become inappropriate where he would be touching me on my butt or my balls or my penis." B.B. would respond that he "didn't know," because he did not know what else to say. He stated that he felt "very uncomfortable," and guessed that he felt "too uncomfortable to say anything." B.B. said that appellant would stroke his penis and cause him to become erect, but not to ejaculate.

{¶ 47} The abuse occurred in the summer of 2019, when B.B. was 13-years-old, and it continued into the fall. Using his cell phone and his calendar, B.B. was able to identify the dates he spent the night at appellant's house, as well as the times he was inappropriately touched, which included August 13 and 26; September 21; October 5; and November 3, 8, and 9. He noted that although he was at appellant's house on October 20, no abuse occurred on that date. B.B. additionally testified that on one occasion, he woke up in the middle of the night, checked his phone, and then looked over to see appellant kneeling in front of the couch, massaging R.H., but because R.H. was covered with a blanket, B.B. could not see exactly what was going on. He also thought

18.

that on one occasion when he and his friend, S.P. were in the same bed, appellant was touching both boys at the same time.

**J.S.**

{¶ 48} T.S.'s younger brother, J.S., testified that he was on a baseball team coached by appellant, and that he would see appellant every day at school. J.S. was part of the group that regularly slept over at appellant's house.

{¶ 49} J.S. confirmed that appellant would help T.S. with homework, and that after appellant's wife went to sleep, appellant would bring food over to their house. When J.S.'s mother began taking his grandfather to chemotherapy in the morning, appellant would wake T.S. up, and if J.S. was not up already, he would wake J.S. as well. He testified that he once saw appellant and T.S. lying down together in T.S.'s bedroom, and that appellant was rubbing T.S.'s back. Usually when appellant was with T.S., the door would be closed and locked.

{¶ 50} J.S. testified that on one occasion, when he was in the eighth grade, appellant picked him and some friends up to go to work out at the school gym. When J.S. got in the passenger seat, appellant reached down and "grab[bed] [J.S.'s] dick" and said, "[O]h, you're hard as a rock, did you just get done doing something with your girlfriend[?]"

{¶ 51} On another occasion, also while J.S. was in the eighth grade, J.S. went over to appellant's house to talk to appellant about an argument J.S. had had with his

girlfriend. Appellant invited J.S. into the basement to have the discussion. Once in the basement, appellant began to massage J.S.'s legs, working his way higher and higher. At one point, appellant's son yelled something down the stairs, and appellant said, "[H]old on, me and [J.S.] are talking, go back upstairs." Thereafter, appellant put J.S.'s legs on top of his, "went underneath" and began stroking the boy, at one point asking J.S. why it took him so long to "get hard."

{¶ 52} On yet another occasion, appellant told J.S. that he was communicating with a 19-year-old girl in another state, who thought appellant was 17. Appellant said that he needed a "dick pi[c]" to send to her, but because his own genitals "looked old and wrinkly," he wanted J.S. to send him a nude picture and a video of J.S. masturbating and ejaculating to send to the girl. J.S. testified that he complied with appellant's request. Appellant also asked J.S. for shirtless pictures to demonstrate the development of his abdominal muscles. Again, J.S. complied with appellant's request. In addition, appellant brought over an electrical razor to show J.S. how to shave his pubic area.

### S.P.

{¶ 53} S.P. testified that he was friends with appellant's son, S.S. In the summer of 2019, S.P. would spend the night at appellant's house, in the basement, and would usually sleep in the bed with B.B, while R.H. would normally sleep "out on the couches." He testified that he and B.B. were in bed one night, when appellant came downstairs and started "massaging" S.P.'s "butt." S.P. did not tell appellant to stop, because appellant

20.

"was kind of in control and he was an adult and I did trust him." S.P. testified that appellant massaged his buttocks twice.

### H.I.

{¶ 54} T.S. introduced H.I. to appellant, who helped organize a memorial for H.I.'s mother after she passed away. H.I. described his relationship with his father as "difficult at times." In a Snapchat exchange with then 16-year-old H.I., appellant told H.I. that he was talking to a girl on Snapchat and wanted to send photos of himself in order to get photos back from her. He told H.I. that "he felt guilty because of his wife," and asked H.I. if he would "assist" him by sending him a picture of the H.I.'s penis, so that he would not have to use his own. H.I. testified that appellant promised to share any explicit photos that he received back from the girl, and so H.I. sent the requested photo of his penis.

### Det. Matthew Collins

{¶ 55} City of Sylvania Police Detective Matthew Collins testified that he forensically extracted a phone belonging to T.S. He testified that a copy of the phone's data was made and the phone was returned to T.S. However, the copy of the phone's data was accidentally deleted when it was being moved from a hard drive to a server. After T.S. smashed the screen, police sent the phone to an out-of-state lab in an attempt to have it rebuilt. Despite these efforts, police were no longer able to recover any of the

21.

information specific to that phone.  However, a copy of an electronic tablet belonging to T.S. was made.  Included in the tablet data were discussions between appellant and T.S.

{¶ 56} A Cellebrite extraction of appellant's phone revealed searches regarding Ohio's sexual battery statute, spousal privilege, statutory rape laws, and age of consent. Examination of an iPad Pro revealed that searches on December 13, 2019 asked, "Can Snapchat recover old my eyes only."  "My Eyes Only" is Snapchat's password-protected storage of videos and photos.  There were also searches looking for "how to recover deleted Snapchat snaps" and asking "[c]an Snapchat recover old files if they have a warrant."  This, in spite of the fact that the Snapchat application was not present on appellant's phone.  Additional searches were related to false accusations and the applicable law.

### Heidi Malott

{¶ 57} Heidi Malott testified as an expert in child abuse disclosure.  She said that about a third of children disclose soon after an event, with another third delaying disclosure, while a large number of victims never disclose at all.  She explained that a child often feels helpless in a relationship with an adult who has authority over the child, causing hopelessness and fear about the result of any disclosure.  She also said that, even if a child does not like the sexual aspect of a relationship, the child might benefit from the relationship with the adult in other ways.

22.

{¶ 58} Disclosure is particularly complicated when the victim and the perpetrator are both male, causing the victim to fear a stigma of homosexuality. She said that disclosures might occur as a result of internal stimuli such as problems eating, sleeping, or concentrating, or the urge to self-harm. She said that suggestibility in interviews – that is, the ability of the interviewer to somehow change or impact a child's memory of an event – was potentially most problematic in preschool children, and that she had little concern that a typical 13-year-old or 15-year-old would be suggestible. Finally, she said that adults from outside the child's family might "seduce the family as well" and "become accepted into the family as part of the family."

### Det. Mark Tupper

{¶ 59} Ottawa Hills Police Detective Mark Tupper testified that Michelle Fournier, a social worker with Children's Services, informed him of T.S.'s disclosure of sexual assault. He said he knew appellant and liked him, and that they had previously had multiple work-related contacts at the school.

{¶ 60} Tupper confirmed that appellant's truck was at T.S.'s home "at all times," causing members of the police department to believe that appellant was having an affair with T.S.'s mother.

{¶ 61} Tupper testified as to whether he interviewed T.S., B.B., R.H., J.S., S.P., and H.I., whether their parents were present during the interview, and whether those individuals were subsequently interviewed at the Child Advocacy Center. He did not

23.

testify as to statements made in those interviews, except to say that certain witnesses made no disclosures of sexual abuse to him.

{¶ 62} On December 13, 2019, Tupper executed a search warrant at appellant's house. Two artificial vaginas were recovered from the residence, as well as a cell phone. Appellant then "offered up" a third artificial vagina. DNA matching the victim was discovered in one of the devices found in appellant's bedroom closet.

{¶ 63} Tupper did not discover any Snapchat evidence on Stevens' phone, but Snapchat's response to a search warrant contained photos, including 200 encrypted images, indicating that the user had saved images or videos to their memories. Tupper explained that "My Eyes Only" encrypts images or videos for the individual's personal viewing, and that Snapchat could not reproduce the images. Encrypted images were replaced with an internet icon in Snapchat's response to the warrant. Images saved by the recipient were also saved on the sender's memories.

{¶ 64} Tupper also examined T.S.'s cell phone and iPad. After the loss of the data during the download of T.S.'s phone, Tupper requested and received information from the cloud storage connected to the phone. Nothing of evidentiary value was revealed. He did, however, find message exchanges between appellant and T.S. on the iPad.

{¶ 65} The iPad contained a text message exchange from March 19, 2019, which was read into the record. During the exchange, appellant remarked, "I'm not going to let you hurt me anymore," to which T.S. responded, "That [sic] all you do to me." T.S. said,

24.

"I never want to have a relationship with anyone because then you try to make me feel bad," and "Every fucking girlfriend is that [sic] the same with you and you always try to make me feel bad about it." Appellant replied, "I get mad because you say we are going to do something. I get excited, then you don't show." The two then proceed to argue about whether T.S. responded more promptly to his girlfriend's messages than he did to Stevens' messages.

{¶ 66} Tupper testified that while appellant was in the county jail, he spoke with his wife in a code that referenced different topics by number and individuals by nicknames. He said that appellant had mailed an index of the numbers to his wife, and that during one call, appellant told his wife that she would have to burn the index and that she could not talk about it, even if they were tortured. Appellant also stated that if there was a shakedown, he would rip the pages out and eat them. Tupper said that a shakedown occurred, but nothing was recovered, except a journal with missing pages in the front.

{¶ 67} Tupper interviewed appellant at the Ottawa Hill Police Department. During the interview, which was recorded, appellant denied ever telling anyone to use Snapchat. Appellant also said that T.S. had a key to appellant's house, but as a result of a disagreement between T.S.'s mother and appellant's family, appellant and his wife decided to take the key away from him.

**Cynthia Nissen**

{¶ 68} Cynthia Nissen, a maintenance mechanic at the school, testified on appellant's behalf. She said that appellant had been her manager. She said that she purchased the tint for the window in appellant's elementary school office door, and that it was placed there so that appellant could hold meetings there without students knocking on the window.

**Appellant**

{¶ 69} Appellant testified that T.S. initiated their relationship by requesting that appellant "double check" on his grades because his mother never did. T.S. was often home alone when his mother went out of town and his brother, J.S., went to his biological father's house. Appellant said that he never met his own father, so he wanted to be sure that T.S. would not have to go through life without a dad. Appellant and his wife started to take care of T.S., allowing him to stay at their house, giving him a key to the house, and assigning him a room and a bathroom of his own. T.S.'s mother never came to parent-teacher conferences or communicated with the teachers, so appellant "took over all communication with teachers and grades and scheduling." Appellant got guardianship of T.S. because of problems "with the school" and "taking him to doctors," and once after a traffic stop by Sylvania Police, T.S. was released to appellant only because of the custody agreement. Appellant said he often was at T.S.'s house late at night, working on cars, helping T.S. do his homework, or doing T.S.'s laundry. Before T.S. learned to

26.

drive, appellant would go to work at 5:30 a.m., return home to pick up his kids and drop them at school, and then go to T.S. and J.S.'s house, get them up, and take them to school. T.S. would sometimes go to appellant's house for lunch, and appellant's wife or kids might or might not be there.

{¶ 70} Appellant said that he communicated with T.S. through Snapchat, or texting, or pinging his phone, in whatever way was necessary to get T.S. to respond. He told T.S. to put the Life 360 application on his phone so that he would always know when T.S. went to school and left school and where he was at all times.

{¶ 71} Appellant acknowledged that he knew T.S.'s class schedule, although he said the school's rotating schedule made it confusing. He denied cuddling with T.S. on a bed, and he denied closing and locking the door to T.S.'s room.

{¶ 72} A good portion of appellant's testimony was devoted to explanations of conversations or events that other witnesses talked about. For example, appellant said that he emphasized the importance of safe sex with T.S. and openly discussed matters of a sexual nature. He said T.S. would frequently brag, "[O]h, I'm going to finish with [my girlfriend] tonight." He said that T.S. did not do well in school, he wanted to go elsewhere, and he wanted to commit suicide. Stevens told T.S.'s mother that T.S. needed counseling or to get out of the school.

{¶ 73} Appellant also described a "huge fight" between his wife and T.S.'s mother during a baseball tournament. He said the tournament was also a family vacation and that

27.

he was trying to spend time with his children, causing T.S. to become "frustrated" because appellant was not spending enough time with him. Appellant and his wife took away T.S.'s key to their house as a result of his wife's dispute with T.S.'s mother.

{¶ 74} Appellant explained that he provided the artificial vagina to T.S. because T.S. was "masturbating seven or eight times a day." He was 15 or 16 at the time, complained that he was bored with masturbation, and -- according to appellant -- said that he wanted to have sex with a 13-year-old girl. Appellant told T.S. about other "options" and showed him an artificial vagina. T.S. asked appellant to get him one.

{¶ 75} Appellant denied saying anything to T.S. after seeing him in the office on December 10. And he said that the elementary school principal had asked him to put up the window tint because the security camera feeds were visible through the window, and "there would be kids peeking in there," and, further, appellant wanted privacy when meeting with and/or disciplining his "team members."

{¶ 76} Appellant testified that on November 9, 2019, T.S. called him and said that he had arrived home to find people drinking and that one individual was allegedly raped. Appellant called Sgt. Sargent, CSB, and the high school principal, to report the incident.

{¶ 77} Appellant stated that J.S. came to him complaining about a rash around his penis after shaving and appellant told him he had to shave with the hair growth. Appellant said he bought J.S. razors "that were for that." He denied ever touching J.S.

28.

**{¶ 78}** Appellant explained that the numbers and "code" that he used during his jailhouse phone calls with his wife were his way of privately communicating with his spouse in an environment where his calls were being recorded. He complained that "[t]his is what the state does is they keep you away from your family." He stated that, during those conversations, he wanted to tell his wife about "what was happening" to him, what his accusations were, and about his "game plan," but that he could not do that on a monitored call. He admitted that the word "cupcake" was code for S.P.

**{¶ 79}** When appellant talked to a CSB worker and learned about the investigation, he went to his wife's grandfather's grave and took a long drive up into Michigan. He turned off his phone, because he had been "inundated with texts and calls, both good and bad." When he eventually turned his phone on, he texted to his wife, "I'm not a good person," and "they will put me in jail."

**{¶ 80}** He explained that his internet searches about "My Eyes Only" were because he had risqué photos of his wife and "the police chief's daughter."

**{¶ 81}** "Calculator Plus" is a computer application that allows secret storage of photos on the phone. Appellant admitted that both he and T.S. had the application on their phones. He also admitted that he objected to allowing his son to speak with CSB, even though his wife suggested that he should. Appellant denied being bisexual and said he was not attracted to the male physique or to teenage boys, but he admitted that he had

29.

a photo of a nude teenage boy masturbating, which he had purchased through PayPal and received through Snapchat.

{¶ 82} The trial court determined that appellant violated the separation of witness order in his communications with his wife and excluded her testimony at trial.

**Assignments of Error**

{¶ 83} Appellant asserts the following assignments of error on appeal:

I. The trial court violated the Appellant's rights to due process and fair trial when it failed to exclude evidence the state had withheld from defense and permitted to be destroyed and permitted the state to develop testimony about evidence.

II. The state committed prosecutorial misconduct in its closing argument that prejudicially affected the substantial rights of the Appellant.

III. The trial court committed plain error in giving an incorrect jury instruction.

IV. Appellant's convictions under R.C. 2907.02(A)(2) are against the manifest weight of the evidence.

V. The trial court erred as matter of law in imposing separate sentences for the allied offenses in violation of the double jeopardy clause of the 5th Amendment to the U.S. Constitution and Article I, Section 10, of the Ohio Constitution.

VI. The trial court erred in denying Appellant directed verdict as to the convictions under R.C. § 2907.03(A)(7), as the state failed to provide any testimony or evidence that Appellant satisfied the requirement of being an authority figure with the ability to exercise an inherent parent-like power over a vulnerable child.

VII. Appellant was deprived of a fair trial by the cumulative errors of the trial court in violation of Appellant's right to due process as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

## Analysis

### I. Failure to Preserve T.S.'s Cell Phone Evidence

{¶ 84} Appellant argues in his first assignment of error that the destruction of T.S.'s phone and the deletion of the forensic download of the phone caused a loss of exculpatory evidence that deprived him of his due process rights.

{¶ 85} "The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects an accused from being convicted of a crime when the [s]tate either fails to preserve materially exculpatory evidence or destroys, in bad faith, potentially useful evidence." *State v. Nastick*, 2017-Ohio-5626, 94 N.E.3d 139, ¶ 8 (9th Dist.), citing *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

31.

"Specific tests are applied to determine whether the state's failure to preserve evidence rises to the level of a due process violation. The test depends on whether the lost or destroyed evidence involves 'material exculpatory evidence' or 'potentially useful evidence.'" *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio -2577, 971 N.E.2d 865, ¶ 73.

{¶ 86} "Evidence is constitutionally material when it possesses 'an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* at ¶ 74, quoting *Trombetta* at 489. Evidence is materially exculpatory "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *State v. Johnson*, 39 Ohio St.3d 48, 61, 529 N.E.2d 898 (1988), quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (Quotations omitted.) *Toledo v. Zapata*, 6th Dist. Lucas No. L-14-1181, 2015-Ohio-3946, ¶ 9, citing *State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991), quoting *United States v. Agurs*, 427 U.S. 97, 109, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "When the state fails to preserve material exculpatory evidence, it per se violates

32.

a defendant's right to due process." *City of Toledo v. Sanders*, Lucas No. L-21-1260, 2023-Ohio-2092, ¶ 26, citing *Powell* at ¶ 74, citing *Trombetta* at 489.

{¶ 87} Evidence is "potentially useful" if "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood* at 57. "Where the state's failure to preserve concerns potentially useful evidence, a due process violation will only be found where the defendant demonstrates that the state acted in bad faith." *Sanders* at ¶ 27, citing *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 10. "Bad faith generally requires something more than bad judgment or negligence; it requires dishonesty, conscious wrongdoing, ulterior motive, or ill will." *State v. Daoust*, 6th Dist. Lucas No. L-21-1055, 2021-Ohio-4400, ¶ 33, citing *Powell* at ¶ 81.

{¶ 88} "Ordinarily, a defendant bears the burden of demonstrating that the lost evidence was materially exculpatory or, in the case of potentially useful evidence, that the state acted in bad faith." *Sanders* at ¶ 30, citing *Daoust* at ¶ 35, citing *Powell* at ¶ 74. "However, a narrow exception to this rule applies where a defendant makes a specific request to have the evidence preserved, and the evidence is lost or destroyed after the prosecution is put on notice of the defendant's request. *Id.*, citing *Daoust* at ¶ 35. "In that case, the burden shifts to the state to show that the evidence was not materially exculpatory." *Id.*, citing *Daoust* at ¶ 35, citing *State v. Benton,* 136 Ohio App.3d 801, 805, 737 N.E.2d 1046 (6th Dist.2000).

33.

## A. Burden of Proof

{¶ 89} Appellant argues that the narrow burden-shifting exception applies in this case, based upon (1) a motion to preserve evidence that he claims to have filed "before trial", and (2) his January 5, 2021 motion to compel. Appellant does not, however, introduce any evidence to show that he moved to have the evidence preserved and/or moved to compel the evidence *before* the telephone evidence was lost or destroyed. As this court made clear in *Sanders*, "[t]he applicability of the burden-shifting exception is a question of timing, not culpability. That is, the inquiry is whether the evidence was lost or destroyed (regardless of the circumstances) *before* or *after* the defendant moves to have the evidence preserved." *Id.* at ¶ 33 (emphasis in original). Absent evidence to establish this critical sequence of events, the burden-shifting exception does not apply, and the burden of proving that the lost evidence was materially exculpatory or that the state acted in bad faith remains with appellant.[1]

---

[1] Although not evidence, appellate counsel argued before this court that the timing of the motion to preserve -- allegedly filed on January 27, 2020, in connection with a prior indictment -- was *irrelevant* in this case, because the victim's phone was returned to the victim before the prior indictment was even filed. If true, this asserted timing of events, suggesting that the evidence was likely destroyed before appellant was ever charged, would only bolster our conclusion that the exception set forth in *Benton* should not apply. The timing issue aside, we note that the January 27, 2020 motion upon which appellant apparently relies sought only to preserve evidence "pertaining to the search of Ronald Stevens belongings on the second floor of the Lucas County Jail on January 18, 2020," and makes no request whatsoever in connection with preserving T.S.'s phone.

34.

**B. Evidence in the phone was not materially exculpatory.**

{¶ 90} Appellant argues that the contents of T.S.'s phone would have been of "crucial importance to the outcome of the trial." Specifically, he states that "[i]f the phone did contain a 'confession', it would have been the single piece of physical evidence that actually demonstrated or corroborated alleged victim testimony in this case." He further argues that "other contents of T.S.'s phone would also have been of material importance to Appellant's defense, as evidence of what TS said to his mother, [to] other alleged victims, and [to] his girlfriend during the time period these events were alleged to have occurred."

{¶ 91} Appellant's initial argument essentially concedes the fact that any so-called "confession" corroborating T.S.'s testimony would not be exculpatory and, instead, would solidify the state's case against appellant. His next claim, asserting that evidence of T.S.'s communications to other individuals *would* have been of material importance, is pure speculation, inasmuch as such evidence might or might not have contradicted T.S.'s testimony in court and, thus, could have exculpated appellant, but also could have inculpated him.

{¶ 92} Finally, appellant attempts to establish that the exculpatory value of the evidence was recognized by law enforcement based upon a single response during cross-examination. The response came when Detective Tupper was asked, during a brief discussion about mistakes that were made during the investigation, a couple of isolated

35.

questions concerning the missing phone data. Specifically, he was asked, "And [T.S.'s] phone was corrupted in the attempt to get the data off it * * * right?" Tupper answered in the affirmative. Then he was asked, "And there very well would have been exculpatory information, true?" Tupper responded, "True." This is not sufficient to establish appellant's burden. Apart from this solitary answer, "True," -- which was provided without additional context -- nothing in the transcript suggests that Tupper or any other member of law enforcement actually saw anything with exculpatory value in the cell phone's data prior to its loss. Accordingly, we find that appellant has not met his burden of demonstrating that T.S.'s phone data constituted material exculpatory evidence. Instead, the evidence was merely "potentially useful."

## C. Because evidence in the phone was merely "potentially useful," there is no Due Process Violation without bad faith.

{¶ 93} Because the missing evidence is only "potentially useful," we must now consider whether the state acted in bad faith. Appellant argues that the state acted in bad faith by "refusing to give the evidence to defense counsel," by "allowing it to be destroyed," and by "subsequently attempting to cover it up on the record." We strongly disagree with appellant's characterization of events. In this case, there is no evidence whatsoever of dishonesty, conscious wrongdoing, ulterior motive, or ill will. The evidence at trial was that T.S.'s first phone was submitted for forensic analysis, but the phone's data was deleted when it was moved from a hard drive to a server due to the volume of materials related to the case. Tupper characterized the loss of data as an

36.

unintentional accident or mistake.  The cell phone itself was damaged after the extraction of data, and data could not be recovered from the victim's phone, even though law enforcement sought the assistance of an out-of-state laboratory in an effort to rebuild the phone.  After the loss of the data during the download, Tupper also requested and received information from the cloud storage connected to the phone, but nothing of evidentiary value was discovered.

{¶ 94} From the outset, the prosecutor was clear that he was uncertain as to whether the data was corrupted or not saved properly.  When Detective Collins testified, he unambiguously testified that the loss of the data was inadvertent.  He said that he forensically extracted the phone and was able to open the data, but he was not able to replicate or save the data.  He explained:

> There were approximately 21 devices that were being extracted related to this case.  All the extractions were stored on the hard drive. Unfortunately the amount of data we're dealing with was hundreds and hundreds of gigs. I had to move that data to a server.  During the transition process, the original extraction was not moved over and it was deleted.

When he was asked whether this was done intentionally, Collins answered, "No." Nothing in Collins' testimony suggests that he reviewed the data in detail or made any assessment of its exculpatory or inculpatory value.  In light of the record before us, we find that the loss of data was inadvertent and unintentional, and was in no way a

consequence of bad faith. Therefore, the inadvertent failure to preserve potentially useful evidence contained in T.S.'s cell phone does not rise to the level of a due process violation. Accordingly, appellant's first assignment of error is found not well-taken.

## II. Alleged Prosecutorial Misconduct

{¶ 95} Appellant alleges in his second assignment of error that the state committed prosecutorial misconduct in its closing argument that prejudicially affected his substantial rights. "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected any substantial right of the accused." *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). Since "[r]ealism compels us to recognize that criminal trials cannot be squeezed dry of all feeling," a prosecutor is "entitled to 'some latitude and freedom of expression' in summation." *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993). However, a prosecutor may not "deliberately saturate trials with emotion," as "[e]xcessively emotional arguments may deny due process." *Id.* And although the prosecutor may "comment upon that which the evidence has shown and any reasonable inferences that can be drawn therefrom," *State v. Roundtree*, 6th Dist. Lucas No. L-14-1052, 2015-Ohio-2230, ¶ 33, and may comment upon the credibility of witnesses based upon their testimony in open court, *State v. Williams*, 2023-Ohio-1748, 215 N.E.3d 629, ¶ 39 (8th Dist.), the prosecutor may not "express a personal belief or opinion as to the credibility of a witness," and, further, may not "vouch" for a witness by implying knowledge of facts outside the record or by

38.

placing the prosecutor's personal credibility in issue. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117.

{¶ 96} The "touchstone of analysis," however, "'is the fairness of the trial, [and] not the culpability of the prosecutor.'" *State v. Hanna*, 95 Ohio St.3d 285, 767 N.E.2d 678, ¶ 61 (2002), quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial, and if it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed."

{¶ 97} Citing *State v. Hall*, 1st Dist. Hamilton No. C-170699, C-170700, 2019-Ohio-2985, for the proposition that in evaluating any harm caused by prosecutorial misconduct during closing arguments "the actions of a prosecutor may combine with an evidentiary error to cause greater impact," appellant argues that, in this case, the prosecutor's closing remarks should be viewed in connection with the state's handling of T.S.'s alleged "confession" -- i.e., T.S.'s disclosure by telephonic note -- that appellant had sexual contact with T.S. *See id.* at ¶ 27. Specifically, appellant complains that the note containing the "confession" was "hidden from defense counsel until direct examination at trial." As revealed by the transcript of the February 2, 2021 pretrial proceeding, however, the unavailability of the phone and its forensic extraction were, in

39.

fact, known to the defense team more than seven months before trial. As there is nothing to suggest that the state "hid" any evidence from appellant, the state's introduction at trial of the (non-exculpatory) telephonic disclosure does not operate to enhance the impact of any error made by the state during closing argument.[2]

### A. Improper Name-Calling During Closing

{¶ 98} In support of his claim of prosecutorial misconduct, appellant complains that the prosecutor during the course of his closing argument referred to appellant as a "predator," a "sexual predator," a "sex offender," a "maniac," a "monster," a "molester," a "child molester," a "manipulator," an "emotional con artist," and a "liar;" and, further, stated that appellant was "obsessive," "possessive," "creepy," "weird," "sick," "sick and twisted," "obsessed with power and control," and had "sick sexual gratification."

{¶ 99} Our review of the transcript reveals that this name-calling did occur, but only occasionally and sporadically throughout the course of the 50-page, and more than hour-long, closing. The majority of the prosecutor's closing argument was devoted to

---

[2] Appellant argues in his reply brief, in connection with his seventh assignment of error, that testimony by T.S.'s mother and girlfriend regarding the contents of the telephonic note violated the hearsay rule. Although -- as we discuss further in our analysis of appellant's seventh assignment of error -- we agree that this hearsay violation did occur, by appellant's own estimation, the so-called "evidentiary error" related to T.S.'s phone "is of much greater import than a simple hearsay violation." "The problem," appellant explains, "is that the prosecution concealed and destroyed the actual phone." Appellant does not argue – and we likewise do not find – that the hearsay violation involving testimony about the (nonexculpatory) contents of the note, when combined with the actions of the prosecution, has the potential to enhance the impact of any error made by the prosecutor during closing argument.

40.

explaining how the evidence adduced at trial satisfied the elements of the offenses charged for each victim.  We note that the terms "predator," "sexual predator," "sex offender," "molester," and "child molester," are descriptive labels that are inherently connected to sexual perpetrators and, although arguably used to stigmatize those labeled as such, were specific to the evidence presented at trial.  *See State v. Kaaz*, 12th Dist. Clinton No. CA2016-05-010, 2017-Ohio-5669, ¶ 59.

{¶ 100} In this case, the prosecutor's invocation of these descriptive labels, together with terms such as "maniac," and "monster," although perhaps ill-advised and improper, were not excessive within the context of the closing argument as a whole and, further, did not purposely or otherwise saturate the trial with emotion.  Especially in this case, where there was abundant evidence of appellant's guilt, including testimony from numerous witnesses, together with DNA, videographic, and iPad text message evidence that corroborated the testimony of one of those victims, we do not find that the prosecutor's occasional and sporadic closing argument name-calling, in itself, rendered the entire week-long trial unfair.  *See State v. Kaaz*, 12th Dist. Clinton No. CA2016-05-010, 2017-Ohio-5669, ¶ 60 (finding that derogatory words used in opening statements did not render appellant's trial unfair, especially as there was overwhelming evidence of the appellant's guilt).

41.

## B. Improper Vouching

{¶ 101} Appellant additionally argues that the prosecutor committed misconduct in closing by improperly vouching for the credibility of the six juvenile witnesses. In particular, appellant complains about the prosecutor's statement that "[i]t is completely unreasonable, implausible, and ridiculous to think that a child would make this up, let alone six kids." He further objects to commentary by the prosecutor stating that there is no "herd immunity" that controls the admission that one is the victim of an assault. In addition, he objects to the prosecutor's statement that a necessary component of being vulnerable enough to admit being a victim of sexual assault is courage, and that the jury saw courage on the witness stand. According to appellant, these two statements together improperly implied to the jury that because admitting that one is a victim of a sexual assault is so difficult, the alleged victims had to be telling the truth. Finally, appellant complains that the prosecutor improperly suggested that none of the alleged victims' parents had coached them in their testimony.

{¶ 102} We note that all of these alleged errors are found in a single paragraph, at the end of the state's closing argument rebuttal comments, representing a tiny fraction of the totality of the prosecutor's extensive commentary. In this case, the jury was properly instructed before and after closing arguments that arguments "are not evidence." The jury instructions unambiguously defined evidence to include only testimony, exhibits, and facts the court required the jury to accept as true. Jurors were also instructed that they

42.

were the sole judges of credibility. Jurors are presumed to follow such instructions. *See State v. Richardson,* 6th Dist. Lucas No. L-06-1038, 2007-Ohio-204, ¶ 46, citing *State v. Fears*, 86 Ohio St.3d 329, 334, 715 N.E.2d 136.

{¶ 103} The instructions both limited the effect of the prosecutor's closing and emphasized the jurors' role as the arbiters of credibility. Even assuming that the prosecutor made some improper remarks during closing arguments, the error was cured by way of the trial court's instruction, so appellant's rights were not prejudiced. *See, e.g., State v. Diar*, 95 Ohio St.3d 181, 2008-Ohio-6266, ¶ 145; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Oho-2128, 767 N.E.2d 166, ¶ 92.

### C. Matters within the Jurors' Realm of Experience

{¶ 104} Next, appellant complains about a comment that the prosecutor made in response to defense counsel's suggestion that if the abuse had happened, someone would have seen it. The prosecutor said, "I submit to you that people have sex in their house all the time when other people are there and these kids don't see it, their own children, or other people." Appellant asserts that "[t]his was not testified to by any witness, and it is beyond the prosecutor's purview to submit any factual information to the jury in closing with the intent [sic] the jury use it to judge witness testimony." The law is clear, however, that a prosecutor is entitled to "refer to matters within the realm of the jurors' common knowledge and understanding" in arguments. *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 244. The prosecutor's statement did not require any

43.

introduction of evidence; the statement was well within the jurors' realm of experience and common knowledge.

### D. Alleged Misstatements of Evidence During Closing

{¶ 105} Appellant asserts that the prosecutor at one point: (1) improperly suggested that evidence of encrypted photos on appellant's phone constituted evidence that H.I. sent appellant a picture; (2) improperly suggested that it was likely that appellant *physically* demonstrated how to shave pubic hair because appellant is "sexually gratified by young boys;" (3) improperly suggested that appellant used actual weapons when he described appellant as having the weapons of "authority and secrecy;" (4) improperly commented that "it's obvious he's guilty;" and (5) improperly implied that "multiple boys" saw appellant "go from kid to kid to see how far [appellant] could go."

{¶ 106} Upon our review of the record, we find that the prosecutor's isolated statements made during closing argument did not taint the fairness of the trial. *See State v. Encarnacion*, 2017-Ohio-5530, 93 N.E.3d 426, ¶ 10 (10th Dist.) ("A prosecutor's isolated comments are not to be taken out of context and given their most damaging meaning."). Because the statements and the sentiment that the statements allegedly conveyed, even if error, were not pervasive throughout the trial, we are convinced beyond a reasonable doubt that, even in the absence of these alleged misstatements, improper statements, and suggestions, the jury would have found appellant guilty.

44.

## E. Repeated Use of the Term "Ejaculate"

{¶ 107} Appellant further asserts that the prosecutor referenced ejaculation "no less than ten times" in order to "disgust the jury and inflame them, and saturate the trial with emotion." We do not find that the mere use of the term "ejaculate" in this case – even ten times during closing – amounted to anything more than proper commentary by the prosecutor.

## F. Alleged Burden-Shifting During Closing

{¶ 108} Appellant argues that the state, in closing, "intentionally confused the jury by shifting the burden of proof to Appellant, implying that defense counsel must prove its defense beyond a reasonable doubt." In support for this contention, appellant states that the prosecutor in closing "spends several minutes talking through one of defense counsel's theories, while repeatedly admonishing the jury that the theory 'is not reasonable.'" Then, immediately after speaking about the unreasonableness of defense counsel's defense, the prosecutor told the jury:

> The state is held to the standard of proof beyond a reasonable doubt. It's not proof beyond all doubt or not proof beyond a shadow of a doubt, it's proof beyond a reasonable doubt. What is reasonable here? Are you fairly convinced that all of this stuff happened? No, because it doesn't make sense.

{¶ 109} Contrary to appellant's argument, the prosecutor did not improperly attempt to shift the burden of proof to him. Instead, the prosecutor was merely stating his opinion based on the evidence at trial. As for appellant's suggestion that the sequence of the prosecutor's comments confused the jury about which side had the burden of proof, we note that the prosecutor correctly indicated that the state was held to the standard of proof beyond a reasonable doubt. Even if the remarks did lead to confusion in this area, the trial court's instructions would have cured any error, so appellant's rights were not prejudiced.

### G. Other evidentiary issues were properly addressed.

{¶ 110} Finally, appellant asserts that "there is evidence in the instant case that the prosecutorial misconduct was in fact an intentional attempt to rehabilitate the damage done to the state's witnesses' credibility by the state's expert witness [in child abuse disclosure]." In making this assertion, he begins by criticizing expert witness Malott's testimony and opinions. Next, he juxtaposes testimony by Malott, wherein she testified that disclosure is a process and occurs after children weigh the risk and benefit of disclosing, with comments by the prosecutor, wherein he stated that disclosures occur when "someone has had enough and summons the bravery to report what has happened to them." Using this example, appellant argues that the prosecutor "lied to the jury about his expert's testimony."

46.

{¶ 111} Arguing in response, the state contends that: (1) "[c]ourage or bravery may well involve a calculation of risk and benefit so that the prosecutor's statements were fair comment on the evidence;" and (2) appellant, in addressing this issue with Malott, is attempting to argue the evidence in the form of a claim of prosecutorial misconduct. We agree with the state on this issue. Because we find that the prosecutor's statements amounted to fair comment on the evidence, and because we believe that appellant is attempting to argue the evidence in the form of a claim of prosecutorial misconduct, we dismiss appellant's argument as meritless.

{¶ 112} In this case, we are persuaded beyond a reasonable doubt that, even without the sporadic name-calling, limited vouching, and isolated potential misstatements of evidence that occurred during the state's closing, a jury would have found the defendant guilty. Appellant's second assignment of error is found not well-taken.

### III. Jury Instruction on Element of Force

{¶ 113} Appellant's third assignment of error claims that the trial court misstated the law in its instructions to the jury related to the type of force required to establish the offense of rape in connection with victims T.S. and R.H., both of whom were older than 13 when the abuse occurred. A trial court is "obligated to provide jury instructions that correctly and completely state the law" when those instructions are "warranted by the evidence presented in a case." *Cromer v. Children's Hosp. Med. Ctr. Of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22. While trial courts are afforded

47.

"broad discretion to decide how to fashion jury instructions," they are still required to "'give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "[A]n appellate court applies a de novo review to determine whether a disputed jury instruction correctly stated the applicable law." *State v. Heiney*, 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 133 (6th Dist.).

{¶ 114} R.C. 2907.02(A)(2), which defines the offense of rape, provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus. "Thus, in sex offense cases involving minors and either parents or other adults in positions of authority, "'[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'"" *State v. Steible*, 9th Dist. Lorain No. 21CA011787, 2023-Ohio-281, ¶ 15, quoting *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N.E.2d 763 (1998), quoting *Eskridge* at 58-59.

48.

{¶ 115} In the instant case, the trial court provided the standard O.J.I. instruction related to force, as modified by Ohio case law when the case involves an authority figure and a child:

Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. When the relationship between the victim and the defendant is one of a child and an authority figure, the element of force does not need to be openly displayed or physically brutal, it can be subtle, slight, or psychological, or emotionally powerful.

Evidence of an express threat of harm or evidence of a significant physical restraint is not required. If you find beyond a reasonable doubt that under the circumstances in evidence, the victim's will was overcome by fear, duress, or intimidation, the element of force has been proved.

Threat includes a direct and an indirect threat. The prosecution need not prove that the victim physically resisted the defendant. * * *

The reasoning set forth in *Eskridge, Dye,* and *Steible* compels the conclusion that the jury instructions comported with Ohio law.

{¶ 116} Arguing to the contrary, appellant asserts that the law set forth in *Dye* requires that where the offender is not a parent, but rather a person in authority, a victim has to be 13 years of age or younger in order for the threat of "subtle and psychological"

49.

force to be sufficient to establish the offense of rape. We disagree with appellant's narrow reading of the law. Although *Dye* did involve a child who was under the age of 13 and a conviction pursuant to R.C. 2907.02(A)(1)(b), rather than R.C. 2907.02(B), the court's statement was not specified to apply only to children under 13. And, in fact, this court has found the law applies much more broadly, both to "cases of rape or gross sexual imposition involving a defendant with some type of parental or similar authority over a child" and to other "situations involving closely-analogous relationships of disparate power between the defendant and victim." *Heiney* at ¶ 107, citing *State v. Fortson*. 8th Dist. Cuyahoga Delaware No. 92337, 2010-Ohio-2337, ¶ 86 (extending "the *Eskridge* rule" regarding "subtle and psychological" force to abuse by a correctional officer against female inmates); *State v. Oddi*, 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926, ¶ 57 (extending Eskridge to sustain GSI conviction against drivers education instructor who, "[a]lthough not a parent, or in loco parentis * * * was certainly in a position of authority" over "a child of fifteen-and-a-half."). The *Eskridge* rule was properly applied to victims T.S. and R.H., in this case, even though they were over 13-years-old when the alleged abuse took place. Appellant's third assignment of error is found not well-taken.

## IV. Manifest Weight of the Evidence

{¶ 117} Appellant argues in his fourth assignment of error that the rape convictions were against the manifest weight of the evidence because the state failed to

show any proof of physical force or the threat of physical force with respect to victims T.S. and R.H.

{¶ 118} "When determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the record, weigh the evidence and all reasonable inferences drawn from that evidence, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Fundamental to the analysis is that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *State v. Gist*, 6th Dist. Lucas No. L-12-1355, 2014-Ohio-3274, ¶ 26, citing *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 119} Appellant contends that the age of T.S. and R.H. weighs against a finding of force necessary for their rape conviction. But as we previously recognized, under Ohio law, the element of force requires an examination of all the circumstances. Here, appellant was an adult, while T.S. and R.H. were minors. Appellant worked in the victims' school as an administrator in a position of authority.

{¶ 120} Appellant had regular parent-like contact with T.S., to the extent that the boy called him "Dad." He had legal temporary custody over T.S. and access to his school records. In addition, he met T.S.'s basic needs of food and, at times, shelter. T.S. testified that he told appellant to stop abusing him, but "[h]e would just keep going" and "nothing would happen."

{¶ 121} Appellant was the coach of R.H.'s baseball team, and R.H. frequently spent the night at appellant's house and, at various times, relied on appellant to drive him and feed him and return him to his home. Describing that appellant is "like an adult and – I don't know, just weird and scary," R.H. was unable to stop the unwanted contact.

{¶ 122} As there was competent, credible evidence to establish the use of force against T.S. and R.H., we find that appellant's rape convictions involving those two victims were not against the manifest weight of the evidence.

### V. The trial court did not err in failing to merge the offenses of rape and sexual battery of T.S.

{¶ 123} Appellant's fifth assignment of error claims that the trial court improperly failed to merge the convictions of rape and sexual battery involving T.S.

{¶ 124} R.C. 2941.25, "Multiple Counts," states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

52.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 125} When considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A), a court must consider the defendant's conduct and how the offenses were committed. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25. "If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance – in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Id.*

{¶ 126} "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C .2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *Id.* In challenging a sentence based on merger principles, the defendant

53.

bears the burden of demonstrating that the convictions should merge. *State v. Washington,* 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

{¶ 127} The offense of rape under R.C. 2907.02 provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The offense of sexual battery under R.C. 2907.03(A)(7) provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is a teacher, administrator, coach, or other person in authority employed by or serving in a school * * *, the other person is enrolled in or attends that school, and the offender is not enrolled in and does not attend that school." It is apparent that the elements which constitute a violation of the rape statute can, under certain circumstances, correspond to the elements which constitute a violation of the sexual battery statute. Thus, if appellant had engaged in one act of oral sex, for example, and was charged under both statutes, it could not be contended that appellant committed separate crimes or had a separate animus. *See State v. Nicholas*, 66 Ohio St.3d 431, 613 N.E.2d 225, 435.

{¶ 128} In this case, however, T.S. testified that appellant performed oral sex on him 150 times, and that he used his hands, his mouth, and the artificial vagina on T.S.'s penis in at least six different locations. In *Nicholas*, the court held that offenses involving distinct forms of sexual activity – in that case, vaginal intercourse, cunnilingus, and

54.

digital penetration – constitute separate crimes, each with a separate animus, and are not allied offenses of similar import. *Id.*

{¶ 129} Here, the state charged appellant with six counts of rape and sexual battery corresponding to the six different locations where the abuse occurred. Because the evidence supported multiple convictions based on separate incidents at each location, the trial court did not err in refusing to merge those offenses. *See State v. Carpenter*, 6th Dist. Erie No. E-00-033, 2002-Ohio-2266, ¶ 76 (where defendant was convicted of multiple crimes (including rape, gross sexual imposition, and sexual battery), involving different sexual activities (including vaginal intercourse, fellatio, cunnilingus, and anal intercourse) between a father and his child on several separate occasions over a period of years, the trial court acted properly in not treating the offenses as allied offenses of similar import). Appellant's fourth assignment of error is therefore found not well-taken.

## VI. The trial court did not err in denying the motion for directed verdict.

{¶ 130} Appellant argues in his sixth assignment of error that the trial court should have directed a verdict as to charges involving sexual battery pursuant to R.C. 2907.03(A)(7), on the theory that the prosecution failed to provide evidence that appellant was an "authority figure with the ability to exercise an inherent parent-like power over a vulnerable child."

{¶ 131} Crim R. 29(A) provides for an entry of a judgment of acquittal if the evidence is insufficient to sustain a conviction. "An appellate court reviews a denial of a

55.

Crim.R. 29 motion for acquittal using the same standard that is used to review a sufficiency of the evidence claim." *State v. Reyes*, 6th Dist. Wood No. WD-03-059, 2005-Ohio-2100, ¶ 21, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995). The Supreme Court of Ohio has stated that the term "sufficiency of the evidence" presents a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a sufficiency of the evidence claim, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 132} A case is suitable for a jury determination when reasonable minds may reach differing conclusions as to the proof of the material elements of a crime. *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978).

{¶ 133} Ohio's sexual battery statute prohibits sexual conduct with another "when the offender is a teacher, administrator, coach, or other person in authority employed by or serving in a school * * *." The words "administrator" and "person in authority" are undefined by statute, so that they may be given their common, everyday meaning. *See State v. Dorso*, 4 Ohio St.3d 60, 62, 446 N.E.2d 449 (1983).

56.

{¶ 134} In the instant case, the state presented proof that appellant fit the description as an administrator and as a person in authority, as those words are commonly used. Appellant's responsibilities as the director of operations at the school permitted him to be defined as an administrator. To be a person "in authority" under R.C. 2907.03(A)(7), "'"[i]t is sufficient for the person acting * * * to be an *authority figure*, with the *ability* to exercise an inherent parent-like power over a vulnerable child."'" *State v. Rober*, 6th Dist. Lucas No. L-14-1168, 2015-Ohio-5501, ¶ 29, quoting *State v. Thomas,* 8th Dist. Cuyahoga No. 88844, 2007-Ohio-4064, ¶ 29, quoting *State v. Vaught*, 9th Dist. Summit No. 22846, 2006-Ohio-4727, ¶ 12 (emphasis sic).

{¶ 135} Here, the victims testified that they saw appellant on a regular basis at the school. His employment at the school allowed him to open the school so that students could work out after school hours. As T.S.'s girlfriend testified, appellant was both "somewhat of a father figure and he worked at the school [T.S.] went to." He was well-known to the assistant principal and to local law enforcement officers as a result of his position at the school.

{¶ 136} Sufficient evidence supported a finding either that appellant was an administrator in the school or that he was in a position of authority in the school. Therefore, appellant's sixth assignment of error is found not well-taken.

57.

## VII. There was No Cumulative Error in this Case

{¶ 137} Appellant argues in his seventh assignment of error that he was deprived of a fair trial as the result of the cumulative effect of errors committed by the trial court. Under the cumulative error doctrine, "'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. McKelton,* 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 321, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio2577, 971 N.E.2d 865, ¶ 223. In determining whether cumulative error is present, an appellate court must first find that multiple errors were committed. *State v. Madrigal,* 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000). And "[t]o affirm a conviction in spite of multiple errors, we must determine that the cumulative effect of the errors is harmless beyond a reasonable doubt." *State v. Anderson,* 7th Dist. Mahoning No. 03MA252, 2006-Ohio-4618, ¶ 80, citing *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987). "The errors may be considered harmless if there is overwhelming evidence of guilt, if Appellant's substantial rights were not affected, or if there are other indicia that the errors did not contribute to the conviction." *Id.*, citing Crim.R. 52(A); Evid. R. 103(A); *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 51.

{¶ 138} Appellant argues that the testimony of both T.S.'s mother and girlfriend violated the hearsay rule when they described the alleged note that T.S. showed to his

58.

mother, disclosing the sexual contact with appellant. Appellant argues that "the alleged note was the single piece of physical evidence that, depending on what it actually said, could prove T.S. was lying or telling the truth in his testimony. Without seeing the actual note, the trial was a battle of witness credibility – either the jury believed T.S. and the other witnesses or Appellant."

{¶ 139} Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). A statement can be a written assertion. Evid.R. 801(A). Statements made outside the courtroom, offered at trial to prove the truth of what they assert, are generally inadmissible as hearsay unless an exception applies. Evid.R. 801(C); Evid.R. 802; *DeMarco* at 195. In this case, the content of the telephonic note was an out-of-court written statement offered to prove the truth of the matter asserted. Its admission was error, but it was also harmless.

{¶ 140} Pursuant to Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." To find an error harmless, a reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. *State v. Lytle*, 48 Ohio St.2d 391, 403, 358 N.E.2d 623 (1976). A reviewing court may overlook an error where the remaining admissible evidence, standing alone, constitutes "overwhelming" proof of a defendant's guilt. *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983). "Where there is no reasonable

59.

possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992).

{¶ 141} Here, the alleged note merely spoke to the manner in which T.S. disclosed the abuse to his mother and girlfriend. T.S. himself did not testify as to its existence. After this initial disclosure (regardless of how it may actually have taken place), T.S.'s mother did nothing more than ask at the school that there be no contact between T.S. and appellant. It was only after T.S.'s subsequent disclosure of the abuse to his therapist, who immediately reported the allegation to authorities, that the investigation began. As a result of the investigation, numerous witnesses were located, interviewed, and then asked to testify. In the face of abundant witness testimony at trial -- and in T.S.'s case, DNA, videographic, and iPad text message evidence to corroborate T.S.'s eyewitness testimony -- there is no reasonable possibility that the disputed testimony contributed to appellant's conviction.

{¶ 142} In addition to the hearsay issue, we also found that several of the prosecutor's statements during closing were improper. In isolation, we found that these errors did not impact the outcome of the trial. We likewise find that the errors do not combine to raise a reasonable probability that the outcome of appellant's trial would have been different. Consequently, we find appellant's seventh assignment of error not well-taken.

60.

## Conclusion

{¶ 143} The judgment of the Lucas County Court of Common Pleas is affirmed.

Appellant is to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J. _____
JUDGE

Gene A. Zmuda, J.

_____
William R. Zimmerman, V.J.        JUDGE
CONCUR.

_____
JUDGE

Judge William R. Zimmerman, Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.